ROBERT B. SYKES (#3180)
C. PETER SORENSEN (16728)
**Sykes McAllister Law Offices, PLLC**
311 South State Street, Suite 240
Salt Lake City, Utah 84111
Telephone (801) 533-0222
Facsimile (801) 533-8081
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**SOUTHERN REGION OF THE CENTRAL DIVISION**

| | |
|---|---|
| GORDON MARBLE,<br><br>Plaintiff,<br><br>vs.<br><br>WADE HOVINGA; HAL STOUT; MIKE FOWLKS, Director, DWR; PAUL WASHBURN, Supervisor; and JOHN DOES 1-10,<br><br>Defendants. | Civil No. 1:19-cv-00064-HCN<br><br>**AMENDED COMPLAINT<br>AND<br>JURY DEMAND**<br><br>Judge: Howard C. Neilson, Jr. |

Plaintiff Gordon Marble complains and alleges for causes of action against Defendants as follows:

**JURISDICTION AND VENUE**

1. This action arises under the United States Constitution and federal law, particularly under the provisions of the Fourth Amendment of the Constitution of the

1

United States, and 42 U.S.C. §§ 1983, 1985 and 1988.

2. This action seeks redress for violations of the civil rights laws of the United States, and jurisdiction is therefore invoked pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983.

3. The claims made in this Complaint occurred and arose in the State of Utah, in this District, and in the Southern Division. Venue is therefore proper under 28 U.S.C. § 1391.

4. Plaintiff is seeking damages pursuant to the claims for relief specified below in amounts to be proved at trial.

## **PARTIES**

5. Plaintiff Gordon Marble ("Gordon") is a citizen of the United States of America and is a resident of West Point City, Davis County, State of Utah.

6. At all times relevant herein, **Wade Hovinga** (hereafter "Hovinga"), was an Officer or Investigator employed by the DWR, and was acting both individually and as an agent of the DWR.

7. At all times relevant herein, **Hal Stout** (hereafter "Stout") was an Officer or Investigator employed by the DWR and was acting both individually and as an agent of the DWR.

8. Defendants **Mike Fowlks** ("Fowlks") and **Paul Washburn** ("Washburn") are or were supervisors of Hovinga and Stout at the relevant time and are responsible for failure to train them in proper handcuffing policy.

9. This action is brought against Hovinga, Stout, Fowlks and Washburn in their individual and official capacities. Their authority to act was derived from Utah State law and/or the commands and directives of their superiors. All of the acts of the individuals and entities listed in the preceding paragraphs were performed under color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Utah.

10. Gordon will serve, or has served, notice of his pendent state claims, if any, against the Defendants pursuant to Utah law. These claims will be amended into this Complaint at a later time. However, Gordon denies that notice is required of any of the current claims in this Complaint since all current claims deal with constitutional violations under 42 U.S.C. § 1983 and Article I of the Utah Constitution, and state law notice of such claims is not required.

## FACTUAL ALLEGATIONS

11. On October 22, 2016, Gordon was hunting on private property owned by a family member.

12. At approximately 9:00 pm, Gordon left the private reserve and was arrested on Highway 89 as he left the property.

13. He was arrested for illegally shooting a mule deer on this property, a rather large 2,500-acre tract of land near Kanab, Utah.

14. Gordon was an occasional hunter, and not cognizant of some of the finer points of hunting regulations.

15. Gordon was unaware that this private property was or could be designated as a no-hunting area by the State of Utah.

16. Gordon had been given full permission by the property owner, a relative, to hunt on the property. He believed he was legally entitled to shoot deer on this land.

17. Gordon possessed all the proper hunting permits and tags to hunt in the region and, but for the property's unknown hunting restriction, would have been in full compliance with all hunting regulations.

18. Gordon was unaware that he and his hunting party were being surveilled from afar by Officers Stout and/or Hovinga with binoculars.

19. When Gordon was pulled over, he was unarmed. Additionally, he had left all his weapons at his family's cabin so there were no firearms in his vehicle.

20. The arresting officers had watched Gordon and his family hunt for hours before the arrest and were fully aware they were unarmed.

21. Gordon was traveling with his son off the property and was obeying all traffic laws at the time he was pulled over.

22. Officers Stout and Hovinga conducted the traffic stop and arrest after Gordon left the private hunting ranch.

23. Officers Stout and Hovinga were investigators and officers with the Department of Wildlife Resources ("DWR").

24. After being stopped, Gordon complied with all commands, was not unruly or aggressive, and admitted to shooting the deer.

25. Gordon explained that he was completely unaware of the hunting restriction on the property, because it was private property owned by a family relative.

26. Gordon was polite and not abusive, aggressive or violent toward the officers.

27. He neither threatened nor posed any threat to Hovinga and Stout.

28. Gordon was placed in handcuffs by Officers Stout and Hovinga with his hands behind his back.

29. Hovinga had extensively researched Gordon and knew he was not a threat.

30. Gordon orally expressed to both Hovinga and Stout that he had an existing, work-caused, torn rotator cuff in his right shoulder that was serious, and that he was still recovering.

31. Gordon clearly expressed that the securing of his hands behind his back with handcuffs was causing him excruciating pain and would probably exacerbate that injury.

32. In spite of this information from Gordon about his injured shoulder, Stout falsely stated that the Officers were required to handcuff Gordon behind his back because "it is policy" to cuff behind the back, and there were no exceptions.

33. Stout falsely claimed "it is department policy" that all prisoners ***must*** be handcuffed in the back. But the actual policy states:

> The Officer may handcuff the prisoner ***with <u>hands in front</u>*** or utilize other appropriate restraining devices where the prisoner:
>
> a. Is in an obvious state of pregnancy.
> b. Has a ***physical <u>handicap</u>***.
> c. Has ***injuries that could be <u>aggravated</u>***.
> d. Must be ***<u>transported to a considerable distance</u>*** over rough roads.
> e. Has ***arms that cannot be physically joined*** in the back.
> f. Persons known to the officer to be ***<u>non-threatening</u>***.
>
> In these cases, the ***handcuffs <u>shall</u> be secured with a belt***, with the buckle located in the rear, or other restraint devices.

*See,* Exhibit 1, ¶¶2(a)-(f), plus end of paragraph (emphasis and <u>double</u> emphasis added).

6

34. Hovinga and Stout's statement about behind-the-back handcuffing being required by policy was false and directly contrary to DWR policy. *See,* Exhibit 1.

35. This behind-the-back handcuffing immediately caused a great deal of pain and discomfort to Gordon, and Gordon so informed Stout and Hovinga that the cuffs were putting significant pressure on his injured shoulder.

36. Stout and Hovinga ignored these complaints and again falsely repeated that they were required to handcuff Gordon behind the back due to "policy."

37. Gordon was transported to Kane County Jail in Stout's DWR vehicle, while handcuffed behind the back.

38. The trip to Kane County Jail was a "considerable distance" away, over bumpy roads, and took roughly 35-40 minutes.

39. The bumpy drive greatly exacerbated Gordon's pain and discomfort caused by behind-the-back handcuffing.

40. During the trip, Gordon repeatedly expressed that he was in excruciating pain due to the behind-the-back handcuffing, and that he was worried about greater injury to his previously injured right rotator cuff.

41. Gordon is a large man and behind-the-back handcuffing would obviously place significant pressure on his shoulders.

42. Gordon was worried his existing injury was being significantly aggravated by the placement of his arms behind his back during the long, bumpy transport. He expressed this to Stout during the drive to Kane County Jail.

43. In an effort to alleviate his pain and protect his previously-injured right shoulder injury during transport, Gordon was forced to strain his left arm as far to the right as he could.

44. This straining with the left shoulder caused a rotator cuff tear in that shoulder.

45. The pain from both shoulders was so intense that it caused Gordon to literally cry out for help, asking for relief from the behind-the-back cuffing, but Stout continued to reiterate that it was "department policy."

46. Handcuffing Gordon in the back not only severely aggravated his right shoulder injury but also caused significant new damage and an additional torn rotator cuff to his left shoulder.

47. Before his arrest, Gordon had been diagnosed with a right rotator cuff injury.

48. After his arrest and transport to the Kane County Jail, Gordon was treated and seen by Dr. Michael Dee, an orthopaedic physician practicing out of Tanner Clinic.

49. Dr. Dee performed a follow up examination for Gordon's rotator cuff injuries.

50. Dr. Dee confirmed that Gordon's pre-existing right shoulder injury was severely aggravated as a direct result of his being handcuffed behind his back for an extended period of time.

51. Dr. Dee also informed Gordon that he now had a torn rotator cuff in his left shoulder, due to behind-the-back handcuffing during the aforementioned ride to the Kane County Jail.

52. Dr. Dee informed Gordon that surgery would be necessary to correct the damage done to both shoulders.

53. On April 25, 2017, Gordon underwent his first surgery to repair the torn rotator cuff in his left shoulder at McKay Dee Hospital in Ogden, Utah.

54. On August 29, 2017, Gordon underwent a second necessary shoulder surgery to further repair his left shoulder. The surgery was also performed by Dr. Dee at McKay Dee Hospital.

55. On September 29, 2017, Gordon underwent yet a third necessary surgical procedure for his left shoulder injury at McKay Dee Surgical Center.

56. Gordon had to wait until his left shoulder was sufficiently healed from his many surgeries before the surgeon could repair the aggravated right shoulder injury.

57. On February 6, 2018, Gordon again underwent the reconstructive surgery for his torn rotator cuff in the right shoulder.

58. On March 23, 2018, a medical professional determined that Gordon's right shoulder had been worsened due to Defendants' actions.

59. This injury was caused and severely aggravated by the events of October 22, 2016, as described above.

60. Gordon participated in physical therapy at Intermountain WorkMed in Ogden, Utah from June 6, 2017 – June 20, 2017. He continued this therapy at home from June 20, 2017 – October 31, 2017 to address the injury to his left shoulder.

61. From March 2018 – June 2018 he began physical therapy for his right shoulder.

62. Gordon incurred medical costs for his four surgeries of at least $100,000, and he has need for ongoing medical treatment for his shoulder injuries.

63. As of September 20, 2017, a medical lien in the amount of $64,710.98 has been filed by Select Health, Gordon's health insurance carrier.

64. Fowlks and Washburn were negligent in the way that they trained their investigators and staff with regard to handcuffing behind the back.

65. Gordon's damages were caused by the negligence of the individual Defendants in training, or in failing to follow DWR's prescribed policy for handcuffing and transporting prisoners.

66. These failures directly resulted in causing and aggravating Gordon's shoulder injuries.

67. Gordon continues to have slight numbness and weakness in his arms.

68. Gordon is unable to enjoy life the way he did before his arrest.

69. Gordon was forced to spend 24 weeks with his arm in a sling.

70. Gordon had to have a PICC line of intravenous treatment for six weeks in his right arm due to the damage caused by handcuffing him in the back.

71. Gordon is unable to work as he did before his injury due to the damage his shoulders have sustained. This caused substantial business losses.

72. Gordon was unable to work for 24 weeks due to his recovery from his multiple surgeries.

73. Gordon was forced to shut down his Southern Utah business operations and closed his business accounts because he was unable to keep them running due to his injuries.

74. Gordon was forced to hire two additional employees to replace him while he has been recovering.

75. Gordon has suffered additional personal and economic losses due to his injuries.

## FIRST CAUSE OF ACTION

### Deliberate Indifference to Medical Needs - Defendants Hovinga & Stout

#### In Violation of The Fourth Amendment
#### Cognizable Under 42 U.S.C. § 1983

76. Plaintiff incorporates by reference all other allegations herein.

77. As an arrestee, Gordon was entitled to basic Fourth Amendment protections against deliberate indifference to physical and medical needs.

78. Objectively reasonable conduct satisfies the fault requirement for claims based on the medical needs of an arrestee and is the standard of culpability to be applied in Fourth Amendment cases.

79. Under Tenth Circuit law as early as 2009, an arrestee had a Fourth Amendment Constitutional right not to be handcuffed in a manner that posed a serious risk of exacerbating a preexisting injury. This right was preexisting in October 2016, when Defendants Stout and Hovinga handcuffed Gordon behind the back. Therefore, Defendants are not entitled to qualified immunity. *Fisher v. City of Las Cruces*, 584 F.3d 888 at 890, 901 (10th Cir. 2009). Among other things, the Tenth Circuit held:

> In so concluding, the court held that "[a]n excessive use of force claim could be premised on [the officer's] handcuffing [of the plaintiff here] if he knew

that she had an injured arm and if he believed that she posed no threat to him." . . . We see no possible basis for reaching a different result in this case.

*Fisher*, 584 F.3d at 901, 902 (citations and some punctuation omitted).

80. At the time Officers Hovinga and Stout handcuffed Gordon behind his back, they had actual notice of his special medical needs, and had a duty to weigh the seriousness of the risk of severe injury to his shoulders against the scope of the request to not be handcuffed behind his back.

81. After being apprised of Gordon's medical condition, Hovinga and Stout deliberately and consciously disregarded the risk of severe injury to Gordon and handcuffed him behind his back.

82. Because Hovinga and Stout were aware of Gordon's condition, the Officers' handcuffing of Gordon behind his back showed a deliberate indifference and a conscious disregard for the risk of severe injury.

83. Hovinga and Stout violated multiple sections of DWR's policies on handcuffing certain persons behind the back, as set forth above. *See*, Exhibit 1, p.2, Part III ¶¶ B. 2(a)-(6).

84. An objectively reasonable officer, who had notice that an arrestee had recent shoulder injury and that he was still in need of further reconstructive surgery and/or where further injury was extremely likely if handcuffed behind the back, and where injury

could be easily prevented by an alternative method of handcuffing, would not have handcuffed Gordon behind his back.

85. In placing Gordon in handcuffs behind his back, Officers Hovinga and Stout ignored Gordon's medical needs in violation of the Fourth Amendment, and their actions directly caused Gordon's injuries.

86. Because of Hovinga and Stout's actions, Gordon has been injured and damaged as set forth herein.

87. The actions of Hovinga and Stout were reckless and Gordon is therefore entitled to punitive damages.

88. The violation of Gordon's rights are actionable under 42 U.S.C. § 1983, and Gordon is entitled to judgment against Hovinga and Stout in an amount to be proved at trial, plus costs and attorney fees pursuant to 42 U.S.C. § 1988.

## SECOND CAUSE OF ACTION

**Excessive Force - Defendants Hovinga & Stout**

**In Violation of The Fourth Amendment**
**Cognizable Under 42 U.S.C. § 1983**

89. Plaintiff incorporates by reference all other allegations herein.

90. The proper focus in determining the reasonableness of force used is on the events *immediately* confronting officers when they decide to use force.

91. Force is not reasonable when a suspect is non-violent and poses no threat.

92. Furthermore, force is not permitted at all when there is no need to use force.

93. Gordon was in a position of total compliance with the commands of Hovinga and Stout.

94. At the time he was arrested, Gordon had shown no tendency toward non-compliance.

95. Gordon willingly went to the Kane County Jail when Hovinga and Stout requested that he do so.

96. Gordon did not resist arrest.

97. At the time Hovinga and Stout loaded him into the vehicle, Gordon was handcuffed.

98. There was no need for Officer Hovinga and Stout to handcuff Gordon behind the back.

99. There wasn't any need to handcuff Gordon at all.

100. Gordon had been completely compliant with the officers' commands.

101. For all of the reasons above, the force used was unnecessary and excessive and a violation of Gordon's right to be free from excessive force.

102. Gordon was injured and damaged by Defendants' actions as set forth herein.

103. The actions of Hovinga and Stout were reckless and Gordon is therefore entitled to punitive damages.

104. The violation of Gordon's rights are actionable under 42 U.S.C. § 1983, and Gordon is entitled to judgment against Hovinga and Stout in an amount to be proved at trial, plus costs and attorney fees pursuant to 42 U.S.C. § 1988.

## THIRD CAUSE OF ACTION

### Failure to Train & Unconstitutional Practices

### Against Fowlks & Washburn, John and Jane Does 1-10
### Cognizable Under 42 U.S.C. § 1983

105. Plaintiff incorporates by reference all other allegations herein.

106. Defendants Fowlks and Washburn were supervisors of Hovinga and Stout. As such, they had a duty to train them in the appropriate DWR handcuffing policy and to ensure they were not only aware of it but practiced it in everyday enforcement work.

107. At all times relevant to this Complaint, Hovinga and Stout were investigators or enforcement officers of the Utah Department of Wildlife Resources.

108. Washburn and Fowlks were responsible for training and supervising DWR officers, for making and enforcing the policies of the Department, and for preventing

the development of practices and customs that violated formal DWR policies and/or which violated the United States Constitution.

109. When they handcuffed Gordon behind his back, Hovinga and Stout were either acting contrary to official training and policy, or were acting in accordance with an unconstitutional practice, custom, and usage of DWR.

110. A 42 U.S.C. §1983 claim may be asserted against a Utah State Department and/or its supervisors, i.e. Fowlks and Washburn, based on allegations of negligence in hiring, training, and/or supervising employees. Additionally, failure to have a written policy, or a policy in place that is customarily not followed, may make the State Department and/or supervisors liable for the deprivation of a person's civil rights.

111. The DWR supervisors knew or should have known that investigators and officers at times encounter handcuffing situations where an arrestee has preexisting conditions or injuries such as rotator cuff injuries, damaged shoulders, etc.

112. In such situations, handcuffing behind the back can lead to further injuries to arrestees, as in Gordon's case.

113. The supervisors had a duty to train their employees on how to handle an arrest involving such an individual so as to prevent causing or exacerbating a serious shoulder injury by handcuffing behind the back, as such injuries are entirely foreseeable and preventable.

114. Supervisors Fowlks, Washburn, and the Does, could have and should have instituted a training program for investigators and officers and instructed them in how to handle an arrest involving an individual such as Gordon, who had a pre-existing shoulder injury.

115. Furthermore, supervisors Fowlks, Washburn and the Does, failed to have a policy to monitor informal, unconstitutional practices by officers regarding the procedure for arresting and handcuffing an individual with a preexisting shoulder injury, or had a written policy that, according to custom and practice, was not customarily followed.

116. By not instituting such a training program, and by not having a written policy, and/or failing to enforce the policy, supervisors Fowlks, Washburn and the Does showed deliberate indifference toward arrestees who might have such injuries.

117. Because of the actions of Defendants, Gordon has been injured and damaged as set forth herein.

118. The violation of Gordon's rights are actionable under 42 U.S.C. § 1983, and Gordon is entitled to judgment against DWR supervisors, including Fowlks, Washburn and the Does, in an amount to be proved at trial, plus punitive damages, costs and attorney fees pursuant to 42 U.S.C. § 1988.

## **JURY DEMAND**

Plaintiff requests a jury trial on all issues in this case.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

1. For general compensatory damages in an amount to be determined at trial;

2. For special damages as are shown at trial;

3. For punitive damages against named individuals as may be allowed by law;

4. For pre-judgment interest on the damages assessed by the verdict of the jury, as allowed by law;

5. For Plaintiff's costs and reasonable attorney fees incurred herein, pursuant to 42 U.S.C. 1988; and

6. For such other and further relief as the Court deems just and proper.

DATED this 23rd day of August 2019.

**SYKES MCALLISTER LAW OFFICES, PLLC**

/s/ *Robert B. Sykes*
ROBERT B. SYKES
C. PETER SORENSEN
*Attorneys for Plaintiff*