# EXHIBIT N

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

_____

Gordon Marble,

    Plaintiff,

vs.

Wade Hovinga, *et al.*,

    Defendants.

No. 1:19-cv-00064-HCN-CMR

Report of Kenneth R. Wallentine

_____

The following report of Kenneth R. Wallentine is submitted after reviewing the following documents, pleadings, records, and reports:

    Plaintiff's Amended Complaint

    Answers of Defendants Hovinga, Fowlks, Stout and Washburn

    Deposition transcripts of Investigator Hovinga, Director Fowlks, Investigator Stout, Lieutenant Washburn, and Plaintiff (with exhibits)

    Miscellaneous photographs

    Probable Cause statements for arrest of Plaintiff, John Marble, and John Bramall

    Defendants' First Interrogatories and Request for Production

    Plaintiff's First Interrogatories and Request for Production and Request for Admissions

    Kane County Jail policy excerpt

    Utah Division of Wildlife Resources policy excerpt

    Audio recordings of plaintiff's arrest conversation

Kenneth R. Wallentine states as follows:

1. In the instant matter, I have relied upon the documents, pleadings, records, reports, and statements previously described. I have formed a number of opinions based upon the aforementioned, as well as my experience, education and familiarity with professional standards, practices and publications. I have relied on a variety of professional publications, including, but not limited to, my own publications and court decisions cited therein. I have considered various statements and accounts that may be in conflict one with another and considered factors such as the time at which the statement was made, the interests of the party making the statement, the vantage and view opportunities and perceptive abilities and consistency or inconsistency with the physical evidence, and evidence of any possible impaired cognition and the collective statements of other witnesses. My opinions, and a summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows:

**Abbreviated synopsis of reported events:**

On October 22, 2016, Gordon Marble ("Plaintiff") was hunting mule deer on the Bristlecone Ranch, a privately-owned and operated ranch near Glendale, Utah, where elk and buffalo are kept secured behind high fences. Hunters pay for access to hunt the captive elk and bison and upland game in hunts guided by the ranch operator. Plaintiff had a license to hunt deer and a tag allowing harvesting of a buck mule deer on the Zion Unit, a Utah Division of Wildlife Resources deer herd unit management area located in Iron, Kane and Washington counties and encompassing much of southeastern Utah. Though the Bristlecone Ranch is located within the Zion Unit, deer hunting is not lawful in any high-fence ranch in the state of Utah.

Utah Division of Wildlife Resources Investigator, Hal Stout, received information that the operator of the Bristlecone Ranch, John Bramall, intended to allow persons to illegally hunt deer within the high-fence area. Investigator Stout took several steps to warn Bramall to not allow the illegal activity. Division of Wildlife Resources Wildlife Biologist, Josh Pollock, communicated

with Bramall and provided him with a copy of the wildlife regulation prohibiting deer hunting within the high-fence area.

Investigator Stout conducted surveillance at the Bristlecone Ranch on the opening day of the general (any weapon) mule deer season on October 22. That morning, he saw Plaintiff and his son, John Marble, with Bramall and a ranch employee. Investigator Stout observed Plaintiff sighting in a rifle. Some time later that same day, Investigator Stout saw Plaintiff engaged in behavior consistent with hunting big game, such as walking a cliff line, using binoculars to scan the terrain, and carrying a rifle.

Investigator Stout heard two gunshots from the area where he saw Plaintiff in apparent hunting behavior. He went to an area above a cabin on the ranch and observed Plaintiff and others load two mature buck mule deer into the back of a pickup truck. Investigator Stout saw Plaintiff and John Marble drive away from the cabin in the pickup truck and Bramall drive away in a Jeep Rubicon. He contacted another Division of Wildlife Resources Investigator, Wade Hovinga, and asked Investigator Hovinga to watch the junction of the access road for the Bristlecone Ranch and U.S. Highway 89 and to stop Bramall and Plaintiff.

Investigator Hovinga stopped Plaintiff and John Marble on Highway 89. Bramall was not stopped. Division of Wildlife Resources Officer Chuck Lawrence arrived to assist. Investigator Stout drove from his observation point and met Investigator Hovinga and Officer Lawrence after Plaintiff was stopped. After some conversation, both Plaintiff and John Marble were arrested.

The officers walked with Plaintiff a little off the road because Plaintiff expressed concern that someone would see him being handcuffed. Plaintiff told the officers that he had a torn rotator cuff. Investigator Stout suggested using two sets of handcuffs with Plaintiff. Officer Lawrence handcuffed Plaintiff. Investigator Hovinga drove John Marble to the Kane County Jail in Kanab, Investigator Stout drove Plaintiff to the same jail.

As Investigator Stout drove, Plaintiff complained several times of discomfort from the handcuffs. Investigator Stout offered on several occasions to pull over and to adjust the handcuffs to facilitate Plaintiff's comfort. Plaintiff told Investigator Stout that he would prefer to

hurry to the jail where the handcuffs could be removed. Approximately six months later, Plaintiff telephoned Division of Wildlife Resources Lieutenant Paul Washburn to complain about the handcuffing.

**Discussion and opinions:**

a. **Handcuffing Plaintiff was consistent with generally accepted police practices, policies and training.**

   1. One of the most fundamental practices taught to police officers is that arrested persons should be handcuffed in nearly all circumstances. Handcuffing a person under arrest is something that officers are commonly taught as a reasonable safety precaution. Officers are taught that handcuffing prior to any transport to jail is an essential practice. Officers are commonly taught in basic police academy training that an arrestee should generally be handcuffed with palms facing out and with the arrestee's arms to the rear. Examples of officers being choked, punched or disarmed by arrestees with handcuffs to the front are commonly cited in police academy training. Handcuffing an arrestee with hands behind the back is very commonly prescribed by police agency policy and training. Handcuffing may prevent the necessity of using force on the arrested person and handcuffing helps protect the arrested person from self-harm. A docile and cooperative arrested person may become aggressive, violent or attempt self-harm when the person recognizes that the arrest will lead to incarceration. Thus, officers are taught, and most agencies require, that handcuffing is a necessary component of the arrest process, whether or not the arrest is for a traffic warrant or some more serious offense and whether or not the arrested person has been cooperative up to the point of handcuffing and transporting to jail.

   2. Though handcuffing of arrested persons is a universal practice, the strong majority of police agencies formalize the handcuffing practice as a part of written policy.

For example, the Utah Division of Wildlife Resources policy in effect at the time of Plaintiff's arrest provides:

> 1, Officers **shall** handcuff (double locked) all prisoners with their hands behind their back except as stated below. 2, The officer may handcuff the prisoner with hands in front or utilize other appropriate restrainingdevices where the prisoner, (a) is in an obvious state of pregnancy, (b), has a physical handicap, (c), has injuries that could be aggravated, (d), must be transported a considerable distance over rough roads, (e) has arms that cannot be physically joined in the back, (f), persons known to the officer to be nonthreatening. In these cases, the handcuff shall be secured with a belt, with the buckle located to the rear, or other restraint devices. (Emphasis supplied)

3. Equally ubiquitous are jail and prison policies that firmly mandate that no arrested person be admitted past the receiving area unless in handcuffs. Many jails dictate that arrestees be handcuffed with their hands behind them. In most jails, jail officers will not open the passage from a sally port unless the arrested person is handcuffed. The Kane County Jail policy provides:

> Prisoners brought to the Kane County Jail will not be admitted unless handcuffed or restrained by other devices which achieve the same function. Prisoners should be handcuffed with their hands behind them.

4. Officers are taught that handcuffing an arrested person with hands behind the back offers greater safety. A subject handcuffed in front is better positioned to grab an officer's gun or other weapon, to strike, or choke an officer. Escaping from handcuffs positioned in the back is more difficult because the subject normally cannot see the locking mechanism and cannot easily use improvised tools or concealed keys to open the lock. A frontally-handcuffed subject can punch and deliver hammer blows; the subject could grab objects in the area and use them as

improvised weapons or projectiles. Investigator Stout recognized the potential dangers of not adhering to the best practice and the policy of handcuffing to the rear. Regarding handcuffing in the front, he testified: "that is not a procedure that I'm comfortable with doing for my safety and for the safety of the person being transported. It's a potential hazard. There's a lot that can go wrong handcuffed in the front. A suspect could use the handcuffs as a weapon, choke you, cause the vehicle to wreck, kill you, and it is just a practice that I don't do."

5. Beyond the possibility that an arrestee handcuffed in front is better positioned to grab an officer's gun or choke an officer, there are many other security purposes for handcuffing an arrestee behind the back. Frontally-handcuffed arrestees are much more able to manipulate door handles, potentially facilitating escape. Frontally-handcuffed arrestees can punch and deliver one- or two-fisted hammer blows; they can grab objects in the area and use them as improvised weapons or projectiles. They can also run and kick more efficiently because their balance is less affected than persons handcuffed behind the back. In sum, the underlying reasons for handcuffing an arrestee behind the back are primarily to protect the officer. A frontally-handcuffed arrestee seated in a front seat can easily lurch toward and grab a gear shift, brake lever and/or steering wheel during transport to jail.

6. The handcuffing of an arrestee is not always mandated with entirely inflexible criteria. Rather, the officer is responsible to assess the circumstances. There are some common exceptions to the general instruction that an arrestee should be handcuffed in the back. For example, an obviously pregnant woman or morbidly obese person might be handcuffed in the front. A small number of arrestees may be physically unable to be handcuffed in the rear. For most such arrestees, a common technique known as "double cuffing," involving the use of two sets of handcuffs, is effective. Double cuffing significantly reduces the extension of the

arms to the rear because it increases the spread of the hands by nine to eleven inches (depending on the type of handcuffs used) and substantially increases the range of lateral movement of the handcuffed person's hands and arms.

7. Plaintiff had been arrested for a felony crime. Though in the clarified (and analytically inappropriate) view of 20/20 hindsight, it seems that Bramall had not told Plaintiff that they were engaged in an illegal hunt within the high-fence area. Notwithstanding, the officers knew only that Plaintiff had committed a felony. They should have acted, and did act, consistent with established police practices and training to deal with Plaintiff as a suspected felon. That entails applying handcuffs for the ride to the county jail. It would have been contrary to police training, practices and policies to *not* handcuff Plaintiff.

8. Wearing handcuffs is an infrequent and unfamiliar experience for most persons. It seems to have been so for Plaintiff; he asked to be moved out of view of passers by so that no one would seem him being handcuffed. Because handcuffs are naturally uncomfortable, it is common for handcuffed persons to complain about the fit. Officers recognize this fact. Lieutenant Washburn testified that arrested persons complain about the discomfort of handcuffs "almost every time. It's very common." Investigator Stout testified that, "handcuffs are uncomfortable and nearly everyone [arrested] discusses it."

9. Reasonable and well-trained officers recognize the discomfort that can result from wearing handcuffs. Handcuffs are safety restraints, not clinical restraints, and they are made of rigid metal and other materials with little maneuverability. Even under the best of circumstances, they just are not comfortable. They are not designed for comfort and are not applied to facilitate comfort. Investigator Stout knew this, and he heard Plaintiff complain of a rotator cuff tear. Investigator Stout responded by suggesting to Officer Lawrence that he double cuff Plaintiff, allowing Plaintiff a much greater range of mobility and ability to move his arms and shoulders as he sat

in the truck and significantly reducing the rearward tension on Plaintiff's arms and shoulders. The officers did, in fact, use two pair of handcuffs for Plaintiff. After Plaintiff was double cuffed, Investigator Stout asked if Plaintiff whether he was more comfortable, and Plaintiff replied, "yes."

10. Plaintiff and Investigator Stout conversed as they drove to the Kane County Jail. Investigator Stout listened to Plaintiff's complaint about the handcuffs, but noted that Plaintiff "was very conversant and didn't seem in great distress to me." As Plaintiff expressed discomfort, Investigator Stout offered on several occasions to pull over and let Plaintiff adjust to become more comfortable. Investigator Stout told Plaintiff that would even stop and take the handcuffs off to give Plaintiff a break and to stretch and allow him to move around. Plaintiff declined each of these offers.

11. Investigator Stout was bound by policy, practice and training, to the ensure that Plaintiff was handcuffed for the ride to the county jail. He would not be allowed to enter the jail with Plaintiff unless Plaintiff wore handcuffs. A reasonable and well-trained officer facing similar circumstances would have handcuffed Plaintiff with his hands to the rear. The Division of Wildlife Resources policy did not suggest otherwise in these circumstances. Plaintiff plainly was not visibly pregnant; he claimed no handicap and none was visibly apparent; he was being driven on a major highway, paved from the point of embarkment to the county jail and definitely not a considerable distance over a rough road; there is no evidence in the record that Plaintiff was so obese or otherwise physically limited that he could not be handcuffed in the standard position; nor is there any evidence to suggest a sure knowledge that Plaintiff was known to be a nonthreatening felon. Investigator Stout heard Plaintiff claim that he had a rotator cuff injury. As a reasonable and well-trained officer would do, Investigator Stout responded to Plaintiff's statement by using a double cuff technique to minimize discomfort, and

he continued to offer to accommodate Plaintiff by offering to stop and remove the handcuffs, allow Plaintiff to rest and stretch and to adjust his position.

12. An officer has a duty to intervene and to take reasonable steps to protect a person from another officer's use of excessive force. Whether a duty to intervene is evident in a particular event must be considered in light of whether apparently unreasonable force was used and whether there was a realistic and reasonable opportunity to intervene. Investigator Hovinga testified that he would intervene if he witnessed a violation of policy in a circumstance where a correction should be made.

13. Neither Investigator Stout nor Investigator Hovinga observed any other officer use force on Plaintiff. They did not see any unreasonable handcuffing technique used on Plaintiff. As noted above, Investigator Stout facilitated using two sets of handcuffs with Plaintiff, which Plaintiff acknowledged decreasing his discomfort. Thus, there was no reasonable opportunity Investigator Stout or Investigator Hovinga to intervene in any other officer's use of force or application of handcuffs on Plaintiff.

b. **The training of the Division of Wildlife Resources officers in the use and application of handcuffs is consistent with generally accepted police policies and practices.**

1. I am personally familiar with the basic police academy training completed by the Division of Wildlife Resources officers. Investigators Stout and Hovinga and Officer Lawrence each successfully completed state-prescribed training programs and had maintained the requisite in-service training hours (no fewer than 40 hours per year, much higher than the number of hours required for most licensed professionals) each year. The Division of Wildlife Resources officers were trained to the level expected and required of a police officer working in the state of Utah. The Utah Council on Peace Officer Standards and Training prescribes and administers basic training courses that are similar to basic police training in

common use throughout the United States. The training completed by these Division of Wildlife Resources officers included scenario-based training that integrated various defensive tactics and arrest control techniques leading to application of handcuffs. The training included repetitive proctored application of handcuffs and having handcuffs applied in both dynamic forceful and passive applications. In addition to training, the program includes practical and written testing on various defensive tactics and force options.

2. Training provided to the Division of Wildlife Resources officers included field and in-service training administered by the Division that was in addition to the state-prescribed training. Such training is consistent with police best practices and exceeds training required by the State of Utah Peace Officer Standards and Training Division. The Division is known for providing excellent arrest control techniques training for its officers. Division leaders recognize that wildlife enforcement officers generally work alone and at great distances from backup, and that they frequently encounter armed persons, and persons who couple alcohol consumption with hunting and fishing. The Division provides annual refresher training on use of handcuffs and on the Division's handcuffing policy. This frequency and scope of training is consistent with best practices in police training.

3. As noted above, most police agencies, including the Division of Wildlife Resources, prescribe handcuffing for common arrest situations. The Division of Wildlife Resources policy on handcuffing and restraints is virtually identical to policies promulgated by the overwhelming majority of Utah police departments and sheriffs' offices. These policies have been vetted by a group of Utah subject matter experts and a national panel of use of force experts.

4. In addition to formal in-service training offered and required by the Division of Wildlife Resources, its officers are required to complete daily training on laws of arrest, agency policy, use of force, application of handcuffs and many dozens of

other common law enforcement learning topics. Officers are required to test for proficiency in their daily training and their progress is monitored by supervisors. The Division provides this training which is not required by Peace Officer Standards and Training Division and exceeds the amount, frequency and relevancy of many agencies.

2. In reaching my opinions in this matter I have relied upon my training and experience in public safety acquired throughout my career. A summary of my qualifications, publications, litigation history and fee schedule are recited herein.

3. **My qualifications as an expert in this subject matter include the following:** I am a law enforcement officer in the State of Utah. I became certified as a law enforcement officer in the State of Utah in 1982. I am the Chief of the West Jordan (Utah) Police Department, where I oversee all police operations and investigations. I am the Chair of the Governing Board of the Officer-Involved Critical Incident Investigations Teams in Salt Lake County, Utah. I was formerly employed with the Utah Attorney General, where I served as the Chief of Law Enforcement. After a period in private practice, I served as a Special Agent with the Utah Attorney General Investigation Division, where I coordinated a statewide use of force training initiative and coordinated officer-involved shooting investigations and other special investigations. I also serve in a consultation role as Senior Legal Advisor for Lexipol, the nation's leading provider of law enforcement risk management resources.

I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah. I also supervised the police service dog training and certification program for the State of Utah. I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.

My duties included direct supervision and command of various investigative units and agents throughout the State of Utah, supervising law enforcement officers, forensic specialists, and technicians. I commanded the State of Utah Child Abduction Response Team. I commanded the State of Utah Officer-Involved Fatality Investigation Team. I am a member of the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations. In 2010, Governor Herbert selected me for the Governor's Leadership in Public Service award for my work in public safety leadership.

4. I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability. I am a certified POST Firearms Instructor, and often served as the lead instructor for POST Firearms courses. I am a member of the Advisory Board of the Association of Force Investigators. I am certified by the Force Science Research Center as a Force Science Analyst® and an Advanced Force Science Specialist®. I am a former certified TASER® Instructor. I am a certified Excited Delirium and Sudden Death Investigation Instructor. I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation. In 2011, I was certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems.

5. I am a licensed attorney, having practiced law since 1990. I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah. I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as the past-President of the Inn of Court. I serve as an Administrative Law Judge for the State of Utah and for various counties and cities in Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities. I was formerly on the

faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies for Public Safety.

6. In addition to my primary employment, I occasionally consult and provide expert witness opinions on police procedures, and use of force issues. I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise. I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies. I am the co-founder of a best practices advisory group that developed comprehensive model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement agencies. These policies serve as a model for all Utah public safety agencies. I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including policy drafting responsibility for large law enforcement agencies. I have served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

7. I participate and serve in a number of community and professional capacities. Professional activities pertinent to law enforcement include serving as a member of the Board of Advisors of the Association of Force Investigators, member of the Board of Directors of the Institute for the Prevention of Sudden In-Custody Death, former member of the Board of Directors of Crisis Intervention Team Utah, Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member of the International Association of Law Enforcement Educators and Trainers Association, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the International Law Enforcement Educators

and Trainers Association, member of the K9 Section of the Utah Peace Officers Association, member of the United States Police Canine Association, past member of the board of directors of the NAACP, Salt Lake City branch, and board member and co-Chairman of the Utah Law Enforcement Legislative Committee. I represent the Utah Chiefs of Police Association on the League of Cities and Towns Listen, Love, Learn Task Force, creating strategies for police reform and relations with communities of color. I am a founding member of First Steps to More Trust, an initiative to join young persons in the BIPOC community with young public safety professionals in leadership training and community engagement. I formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training. I am a former member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University. I have been a presenter at a variety of professional conferences and seminars, including presenting on use of force training at the annual convention of the International Association of Chiefs of Police and the International Conference of the Institute for the Prevention of Sudden In-Custody Death.

8. From 1994 to 2014, I was a consultant with the K9 Academy for Law Enforcement and the International Police Canine Conference. My principal responsibilities included providing use of force training, civil liability instruction, and search and seizure instruction. I have provided police service dog training and certification standards consultation for two police service dog organizations, including a western regional group and one of the major national groups. I serve as a consultant for the California Narcotic and Explosive Canine Association and have been a featured lecturer at their annual training conference over the past decade.

9. I am a Senior Legal Advisor for Lexipol. In that capacity, I have assisted in the drafting and review of use of force and other policies in current use by more than 3,300 public safety agencies in the United States.

10. **My publications (limited to ten years) include the following:** I have previously published a number of other professional articles, many of which have been subjected to peer review. My most recent book, *Preparing for an Active Shooter Threat*, was published in June 2020 by Blue360 Media. Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, 2nd edition, was published in 2020 by the American Bar Association Publishing Division. *The K9 Officer's Legal Handbook*, 3rd ed., was published in February 2019. My other published works include: *Mitigating Suicide Threat Response Risks*, Police Chief, V. 86, No. 3 (2019); *Avoiding a Peer Support Pitfall*, Police Chief, V. 85, No. 3 (2018); *Should I Stay or Should I Go?*, POLICE, October 2017, *Hill v. Miracle: Adapting the Graham Standard to Non-Criminal Interventions*, Police Chief (August 2017): 18–19; *Armstrong v. Village of Pinehurst: Training and Policy Implications for Police*, Police Chief, V. 83, No. 6 (2016); *Supreme Court Decision Casts Doubt on Hotel Registry Ordinances*, Police Chief, V. 81, No. 10 (2015); *Body Worn Cameras: Plan Before Your Office Buys In*, The Sheriff (June 2015); *Legal Risks of Failing to Care for Children of Arrested Persons*, Police Chief, V. 81, No. 10 (2014); *A Rational Foundation for Use of Force Policy, Training and Assessment*, 2014 (2) AELE Mo. L. J. 101; *Post Incident Video Review*, Police Chief, V. 68, No. 12 (2011); *Cell Site Location Evidence: A New Frontier in Cyber-Investigation*, 2011 (2) AELE Mo. L. J. 501, *Prospects, Pitfalls and Pains of Social Media and Public Safety*, The Municipal Lawyer, September 2010; *Police Department May Read Text Messages Sent on Agency-issued Pagers: City of Ontario, California v. Quon*, Police Chief, V. 57, No. 8 (2010); *Collection of DNA Upon Arrest: Expanding Investigative Frontiers*, Police Chief, V. 57, No. 1 (2010); *Targeting TASER: The New TASER Aim Points,* Law Officer, January 2010.

11. **My fee schedule is established as follows:** I charge $250.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony, with a minimum of $1,000.00 for deposition or court testimony. I bill for actual travel expenses and a travel time fee of $1,000.00 per day/part-day for travel to western states and $1,500.00 per day/part-day outside western states.

12. **My prior experience as an expert witness (limited to the past four years) includes the following cases:** I have been qualified as an expert in the subject matter of police procedures, including use of TASER® devices, police use of force, shootings and wrongful death claims, search and seizure, police service dog use, both in drug detection and dog bites, and I have never had a court decline to find that I am a qualified expert witness. I have testified and/or provided depositions and trial testimony in the following cases which may be generally related to the subject of the instant litigation in the past four years: *Johnson v. City of Mesa*, No. 2:19-CV-02827-JAT-JZB, United States District Court for the District of Arizona, 2020. Deposition testimony given on behalf of defendant. Subject matter: use of force. *Ortega v. United States of America*, No. CV-19-08110-PCT-JAT, United States District Court for the District of Arizona, 2020. Deposition testimony given on behalf of defendant. Subject matter: police custody. *Peralta v. Lee County Sheriff's Office*, No. CV-17-01868-DJH-BSB, United States District Court for the District of Arizona, 2020. Trial testimony given on behalf of defendant. Subject matter: police custody. *Krakana & Zinn v. City of Scottsdale*, No. CV-17-01813-PHX-JJT, United States District Court for the District of Arizona, 2020. Trial testimony given on behalf of defendant. Subject matter: police tactical operation. *Smith v. City of Waterloo*, Case No. LACV133172, District Court for Black Hawk County, Iowa, 2019. Trial testimony given on behalf of defendants. Subject matter: emergency vehicle operation. *Mould v. City of Tempe*, No. CV2016-018161, United States District Court for the District of Arizona, 2019. Trial and deposition testimony given on behalf of defendant. Subject matter: wrongful death. *Castro v. State of Arizona*, Case No. 2:18-cv-00753-SRB, United States District Court for the District of Arizona, 2019. Deposition testimony given on behalf of defendants. Subject matter: police use of force. *Lawrence v. Las Vegas Metro Police Department*, No. 2:16-cv-03039-JCM-NJK, United States District Court for the District of Nevada, 2019, Deposition testimony given on behalf of defendants. Subject matter: wrongful death. *Webb v. City of Waterloo*, No. 6:17-cv-2001-CJW-MAR, United States District Court for the Northern

District of Iowa.  Deposition testimony given on behalf of defendants.  Subject matter: police use of force.  *Charboneneau v. Demings*, No. 2017-CA-010862-O, Ninth Judicial District Court, Orange County, Florida, 2019.  Hearing testimony given on behalf of defendants.  Subject matter: use of force.  *Carsons v. Black Bear Reserve Homeowners Association, Inc., et al.*, No. 35-2015-CA-001910, Fifth Judicial District Court, Lake County, Florida, 2018.  Deposition testimony given on behalf of defendants.  Subject matter: investigative procedures.  *Mould v. City of Tempe*, No. CV2016-018161, United States District Court for the District of Arizona, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.  *McSwain v. United States*, No. 2:15-cv-01321, United States District Court for the District of Nevada, 2018.  Trial testimony given on behalf of defendant.  Subject matter: negligence.  *Rodriguez v. City of West Covina*, No. 2:17-CV-0138 CBM, United States District Court for the Central District of California, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: police canines.  *Mims v. City of Charlotte*, No. 2014-CVS-23815, Superior Court of North Carolina, 2018.  Trial and deposition testimony given on behalf of the defendants.  Subject matter: wrongful death.  *Chastang v. Levy*, No. 6:17-ev-00538-0r1-37 DCI, United States District Court for the Middle District of Florida, 2018.  Deposition testimony given on behalf of defendant.  Subject matter: police defensive deadly force.  *Johnson v. Peay*, No. 160700949, Second District Court, State of Utah, 2017.  Trial testimony given on behalf of defendant.  Subject matter: police force to effect arrest.  *Brunette v. Burlington*, No. 2:15-cv-61, United States District Court for the District of Vermont, 2017.  Deposition testimony given on behalf of defendant.  Subject matter: wrongful death.  *Landon v. City of North Port*, No. 8:15-cv-02272-CEH-JSS, United States District Court for the Middle District of Florida, 2017.  Deposition testimony given on behalf of defendant.  Subject matter: police force to effect arrest.  *Christiansen v. West Valley City, et al.*, No. 2:14-cv-00025, United States District Court for the District of Utah, 2016.  Trial testimony given on behalf of defendants.  Subject matter: police force to effect arrest.  *State v. Barney*, No. 161300117, Fourth District Court, State of Utah, 2016.  Trial testimony given on behalf of the

prosecution.  Subject matter: use of force.  *United States v. Jereb*, No. 2:15-mj-00356, United States District Court for Utah, 2016.  Trial testimony given on behalf of the prosecution.  Subject matter: use of an electronic control device.  *Talley v. City of Charlotte*, No. No. 3:14 CV 683, United States District Court for the Western District of North Carolina, 2016.  Deposition testimony given on behalf of the defendants.  Subject matter: negligent custody.  *Gonzales v. Douglas*, No. CV-15-00064-PHX-NVW, United States District Court for the District of Arizona, 2016.  Deposition testimony given on behalf of defendant.  Subject matter: police force to effect arrest.  *McDonald v. Dupnik*, No. C20142895 Superior Court, State of Arizona, Pima County, 2016.  Trial and deposition testimony given on behalf of defendants.  Subject matter: police force to effect arrest.

The observations and opinions stated herein are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process.  They are based on the best information presently known to me.  I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with physical evidence, that were provided to me.  The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any report submitted by plaintiff's experts, further investigation and/or further witness interviews.  I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or diagrams, video and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.

## Conclusion

Investigator Stout arrested Plaintiff for a felony crime. Consistent with widely-accepted police practices, policies and training, and pursuant to proper Division of Wildlife Resources policy and training, Officer Lawrence handcuffed Plaintiff. Investigator Stout responded to Plaintiff's complaints of discomfort appropriately and in a manner consistent with that of a reasonable and well-trained officer.

*[signature]*

Kenneth R. Wallentine
November 25, 2020