Robert B. Sykes (#3180)
C. Peter Sorensen (#16728)
Christina D. Isom (#17244)
**SYKES MCALLISTER LAW OFFICES, PLLC**
311 South State Street, Suite 240
Salt Lake City, Utah 84111
Telephone No. (801) 533-0222
bob@sykesmcallisterlaw.com
pete@sykesmcallisterlaw.com
christina@sykesmcallisterlaw.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| GORDON MARBLE, <br><br> Plaintiff, <br> v. <br><br> WADE HOVINGA; HAL STOUT; MIKE FOWLKS, Director, DWR; PAUL WASHBURN, Supervisor; and JOHN DOES 1-10; <br><br> Defendants. | **PLAINTIFFS' OPPOSITION MEMORANDUM IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 1:19-cv-00064-HCN <br><br> Judge Howard C. Neilson, Jr. <br><br> Magistrate Judge Cecilia M. Romero |

Plaintiff Gordon Marble submits herewith his Opposition Memorandum in Response to Defendants' Motion for Summary Judgment.

## INTRODUCTION

Courts have repeatedly held that qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Mglej v. Garfield Co.,* 2019 WL 190459 at *6 (D. Utah 2019) (citing *Grissom v. Roberts,* 902 F.3d 1162, 1167 (10th Cir. 2018) (quoting *Kiesla v. Hughes,* 138 S.Ct. 1148, 1152 (2018) (internal punctuation omitted). This standard

applies here. Handcuffing Gordon Marble (Gordon) under the circumstances in this case, Defendants were either plainly incompetent and/or knowingly violated the law.

This case analyzes the violation of Gordon Marble's constitutional right to be free from excessive force during an arrest as well as deliberate indifference by law enforcement officers who knew he had a pre-existing shoulder injury that might be exacerbated by their use of handcuffs. The Fourth Amendment's proscription against the use of excessive force against an arrestee is clearly established. The Fourteenth Amendment's proscription against violation of due process is equally clearly established. The matters in this case as viewed by Plaintiff and Defendants demonstrate that there is a wide variance in perception and significant disputes regarding the operative facts. The myriad of disputed facts go to the heart of this controversy. Whether Defendants used excessive force and acted with deliberate indifference in unreasonably handcuffing and transporting Gordon in the manner which they did, should be left for a jury to decide. These material disputes make summary judgment as a matter of law inappropriate. Plaintiff respectfully requests that this Court deny Defendants' Motion for Summary Judgment and allow a reasonable jury to sift through the disputed facts in order to come to a final determination on the merits of the competing claims in this matter.

## **BACKGROUND**

On October 22, 2016, Gordon Marble, his son, John Marble, and his brother-in-law, John Bramall, were hunting on an enclosed private ranch owned by John Bramall near Glendale, Utah. Gordon and John Marble had previously arranged all the licensing and permits necessary and had received permission to hunt on the property. Gordon believed he was legally entitled to hunt deer on this property, as his brother-in-law encouraged and assured him it was legal. Gordon was unaware, however, that the Division of Wildlife Resources of the State of Utah

("DWR") had designated this private property as a "no-hunt" area due to the high fence surrounding the property, of which his brother-in-law was aware. Gordon was also unaware that DWR Officer Stout was surveilling the hunting party from a nearby ridge throughout the day. Both Gordon and John Marble shot mule deer while hunting on the property.

At the conclusion of their hunt, Gordon returned to the family cabin to drop off the hunting gear, including weapons, and proceeded to take the deer into town to be processed. Officer Stout watched this activity and called Officer Hovinga to assist him in stopping the hunters when they left the property. Officer Hovinga then called Officer Lawrence, another DWR Officer, to assist in the traffic stop. Stout drove from his observation point to the traffic stop.

Once Gordon and John exited the property, Hovinga conducted a traffic stop to detain them. Hovinga first spoke with Gordon for approximately 30 minutes. During this initial interview, Hovinga read Gordon his Miranda rights, and formally placed him under arrest for illegal hunting. During this interview, Gordon was calm and cooperative with Hovinga's requests and answered all the questions asked of him. Gordon was fully compliant and never physically, or verbally threatened any Officers that day. Hovinga made no effort to place handcuffs on either Gordon or John during this time. Officer Stout finally arrived on scene approximately 30 minutes after the initial stop.

Additionally, when Stout arrived, Gordon also told him about his suspected right shoulder rotator cuff injury. Gordon also told Lawrence, Hovinga and Stout to be very careful putting handcuffs on him because of his pre-existing injury to his right rotator cuff.

Stout and Hovinga were present and actively engaged with Gordon, while Lawrence placed the handcuffs on Gordon. Gordon could not join his hands behind his back, so

Stout offered his set of handcuffs to "double cuff" Gordon's hands behind his back. Gordon again told Officers during the handcuffing that he was going to be in a lot of pain.

After placing Gordon in handcuffs, Stout and Lawrence helped Gordon into Stout's truck for transport to the Kane County Jail. The transport lasted approximately 45 minutes. During the transport, Gordon was cooperative and never physically or verbally threatened Stout. Throughout the drive Gordon expressed even more increasing pain in his right shoulder. Gordon expressed to Stout approximately fourteen (14) times the pain and discomfort that handcuffing behind his back was causing him. Stout acknowledged that Gordon was in pain and asked, at one point, if Gordon wanted to get out and stretch. Gordon declined because Stout informed him, he would need to be re-cuffed. He wanted to get out of the handcuffs as soon as possible and did not want to be re-cuffed. Finally, as Stout was pulling into the sallyport at the jail, Gordon's left arm hit the armrest, and he cried out in pain and explained to Stout that his left shoulder was just injured. The handcuffs were not removed until Gordon was booked into the Kane County Jail, approximately fifteen (15) minutes after arrival.

Over the next several months, Gordon hoped that the pain in both his left and right shoulders would subside. He tried to rehab his shoulder on his own with physical therapy to avoid surgery. However, after roughly six months, his pain became so bad that he went to an orthopedic doctor who diagnosed him with torn rotator cuffs in both his left and right shoulders. He subsequently had four surgeries and was out of work and in slings for approximately 24 weeks. Gordon has suffered tremendous pain, loss of mobility, significant medical costs, and a loss of business opportunities as a result of his injuries caused by the arrest and unreasonable excessive force of handcuffing by Defendants.

The Utah DWR handcuffing policy allows under certain conditions, for handcuffing to be done in the front rather than behind the back. The purpose of the policy is to properly address pre-existing injuries and conditions that might be made worse if behind the back handcuffing is utilized during detention. Based on his pre-existing injuries, Gordon was eligible to be handcuffed in the front under the DWR's handcuffing policy. However, Defendants chose not to utilize the policy even though they knew or reasonably should have known that it was applicable in Gordon's circumstances.

## RESPONSE TO DEFENDANTS' UNDIPUTED FACTS

Pursuant to Rule 56(a)(2), F.R.Civ.P., Plaintiff denies, or disputes Defense facts as follows:

**6.** Mike Fowlks does not oversee training. Defense Ex. G, Fowlks Depo., 5:21-24.

**RESPONSE:** **Deny in Part.** Defendant Fowlks testified in his deposition that he does not oversee training. *See* Plaintiff's Exhibit 12, Michael Fowlks Deposition 11:11-12:6, 19:4-25. However, he also testified in his deposition that he "supervises and oversees all the divisions," as the Director of the DWR. It is disputed that Fowlks did not know or was not aware of training that was and is provided to the Officers within the DWR. Additionally, as the Director of the DWR he makes the final decisions on policy and training that is required for DWR officers.

**10.** Washburn does not develop or conduct DWR training. Defense Ex. H, Washburn Depo., 5:5-6.

**RESPONSE:** **Deny in Part.** Defendant Washburn denied developing training for his Officers, or that he conducts training for DWR. However, he also admits to scheduling and

making sure training takes place for Officers. It is also disputed that Washburn is not heavily involved in the types of training or what policies are trained on and when they are scheduled.

      13.    Gordon Marble is partial owner of Marble Ventures, a company that fabricates and installs natural stone products, including granite and marble, which can weigh up to 1,000 lbs., Defense Ex. I, Marble Depo., 65:17-66:17. Marble worked 50-60 hours a week in his role as owner and was involved in all facets of the business, including hands-on lifting of granite and marble stone, and installation training. *Id.* at 67:11-69:15.

      **RESPONSE: <u>Deny in Part.</u>** Gordon Marble is the owner of Marble Ventures. Additionally, the unfabricated granite and marble weigh up to 1,000 pounds. However, as Gordon testified, the fabricated, ready to install, marble and granite pieces that he works with weigh from 80-300 pounds. *See,* Gordon Marble Depo., 66:11-17. For tax purposes, ownership interests may be different based on varying years, however, Gordon is the owner.

      21.    Lawrence was nearby and assisted Hovinga in the stop. Defense Ex. C, Crime Report, page 8.

      **RESPONSE: <u>Deny in Part.</u>** There is no indication on where exactly Lawrence was prior to his arrival on scene. Additionally, it was testified by Stout that Lawrence arrived either right before or right after he arrived on scene, which was approximately 30 minutes after Hovinga had initiated the traffic stop on the Marbles. *See* Plaintiff's Exhibit 9, Hal Stout Deposition, 11:17-25; Plaintiff's Exhibit 1, Crime Report p.6.

      26.    When Stout arrived, Hovinga briefed him on Marble's interview and then interviewed John Marble. Defense Ex. D, Hovinga Dep., 14:13-20; 15:13-21; Defense Ex. I, Marble Dep., 31:1-12; Defense Ex. R, Stout Audio 1:42, Defense Ex. S, Transcript, 1:8-4:8.

**RESPONSE: Deny in Part.** It is vague as to when and how quickly Stout was "briefed" by Hovinga after he arrived on scene.

31. As Lawrence was placing Marble in handcuffs the following conversation occurred:

| | |
|---|---|
| "LAWRENCE: | Okay. Can I just have you interlock your fingers and place them on the back of your head for me. |
| STOUT: | You do want this jacket, though? |
| MARBLE: | Yeah. |
| LAWRENCE: | Widen your stance for me. I don't want you falling over. A little wider. Okay. Look to your left. And for your safety (inaudible), okay? Okay. Bing this elbow back. |
| MARBLE: | Just don't hurt me, whatever you do. |
| LAWRENCE: | I'm doing -- I'm going to be soft. |
| MARBLE: | I'm a good guy. Yes, I've got a rotator cuff that's the right shoulder. |
| LAWRENCE: | Okay. Well -- that's a sore rotator cuff? |
| MARBLE: | Okay. You can feel it. I'm not - I'm not joshing you. |
| LAWRENCE: | No, I believe you. |
| MARBLE: | So that hurts right there pretty bad on the right, so . . . |
| | Defense Ex. S, Transcript, 17:1-7; Ex. R, Stout Audio, 23:58. |

**RESPONSE: Deny.** The Defendants citation to the transcript is not correct. The correct citation to this segment of the conversation is: Plaintiff's Exhibit 3, Audio Transcript 16:9-17:7. Additionally, Plaintiff denies that this is the full context of the conversation during the handcuffing of Gordon. Listening to the entire interaction and reading the transcript of the

interaction shows that Gordon was clear about his right shoulder injury before Lawrence placed the handcuffs on him. Further, the transcript ends with Lawrence just referencing the tightness of the handcuff, and Gordon stating he does not know how they are supposed to feel. *See* Plaintiff's Exhibit 3, Audio Transcript 15:14-18:16.

32.     Hearing the conversation, Stout gave Lawrence a second set of handcuffs, and Lawrence linked the two sets of cuffs together to double-cuff Marble with his hands behind his back and told him the extra cuffs would "give him more mobility." Defense Ex. B, Stout Depo., 17:17-18:1; Ex. I, Marble Depo., 38:18-20; Stout Audio, 25:00; Ex. S, Transcript, 17:8-9.

**RESPONSE: <u>Deny in Part.</u>** The implication made by this statement is that Stout did not participate readily in the handcuffing of Gordon Marble. However, it is greatly disputed that Stout did not just "overhear" the conversation of Lawrence and Gordon but was in fact actively engaged in the conversation while Lawrence physically placed the handcuffs on Gordon. Additionally, Stout was the Officer who made the final decision to handcuff and take Gordon and John to the Jail to be charged with a crime. *See* Audio Transcript 15:14-18:16.

36.     Other than the initial interview he conducted with Marble, Hovinga did not interact with Marble. Hovinga testified in his deposition as follows:

"Q.     Who took over, for lack of a better word, handling Gordon Marble while you were talking to John Marble?

A:     It would be either Officer Chuck Lawrence or Investigator Hal Stout or both." Defense Ex. D, Hovinga Depo., 15:13-17.

*****

"Q:     Did you ever tell Gordon Marble that it was DWR policy to handcuff in the back?

A:     No." *Id.* at 16:6-8.

*****

"Q:     Do you know who placed Marble in handcuffs?

8

A:      I don't know that for sure.

Q:      You weren't around at the time or were you talking to John at the time when Gordon was placed in handcuffs?

A:      I wasn't around at that time. I was with John [Marble]." *Id.* at 16:15-

20.

*****

"Q:     Are you aware if Marble could have his hands physically joined behind his back?

A:      I'm not aware." *Id.* at 20:4-7.

*****

"Q:     Did you ever feel like you had discretion to change the position of Marble's handcuffs?

A:      No, I wasn't. I was removed from him through that whole time." *Id.* at 20:20-23.

*****

"Q:     Did you ever help to load Gordon Marble in or out of the vehicles?

A:      No." *Id.* at 22:4-6.

*****

"Q:     And do you have any personal knowledge as to any of the facts stated in this document? Defense Ex. F, Washburn Notes.

A:      No because I wasn't involved in the handcuffing and arrest of Gordon Marble." Defense Ex. D, Hovinga Depo., 31:18-21.

**RESPONSE:** **Deny.** Gordon denies that Hovinga did not have any further interaction with him after the initial interview. Gordon believes that Hovinga was present and helping Lawrence, and Stout during his handcuffing. Additionally, Gordon believes firmly that it was Hovinga or Stout with whom he spoke at the Jail when he asked him to feel his shoulder and the knot that had formed after it had popped during his transport. Further, a reading and listen to

the audio transcript of the events show that Hovinga was actively participating with Lawrence and Stout who were handcuffing Gordon. *See.* Marble Affidavit, ¶6; Audio Transcript 15:14-18:16, Stout Audio, 22:13-26:43.

**37.** Marble never told Hovinga that he had a shoulder injury of any kind. Defense Ex. D, Hovinga Dep., 19:5-20; 23:25-24:7.

**RESPONSE: <u>Deny</u>.** Gordon believes that he told Hovinga about his shoulder injury during his handcuffing on the side of the road after being detained by Hovinga. Additionally, he mentioned his injury to him upon arrival to the jail after transport. *See* Marble Affidavit ¶10.

**38.** Stout drove Marble to the Jail with Marble in the front passenger seat. During the drive, Marble was seated in close proximity to Stout's firearms and other potential weapons and the vehicle controls. Defense Ex. P, Response to Interrogatory No. 11. The trip lasted approximately 45 minutes. Defense Ex. B., Stout Depo., 22:14-18; Defense Ex. R, Stout Audio.

**RESPONSE: <u>Deny in Part</u>.** Plaintiff denies the implication that Gordon was ever a threat to Officer Stout by simply being in "close proximity to the firearms and other potential weapons." Officer Stout, and Hovinga both testified several times that Gordon was cooperative, and never a threat to their safety. It is misleading to mischaracterize the nature of Gordon's transport to the Jail as if he was a threat to the officers. Further, Hovinga told Stout, referring to Gordon, as a "good guy." *See* Stout Depo., Plaintiff's Exhibit 10, Wade Hovinga Deposition, 13:6-15; 23:25-25:1; 33:13-18; Exhibit 2, Audio, 0:02:46; Exhibit 3 3:25.

**39.** A docile and cooperative arrested person may become aggressive violent or attempt self-harm when the person recognizes that the arrest will lead to incarceration. Defense Ex N, Ken Wallentine Report. Officers have no reliability consistent and foolproof predictor of aggressive behavior. *Id.*

**RESPONSE: Deny.** This is Defendants' expert **opinion**, certainly not an undisputed fact.

46. Stout did not know Marble injured his left shoulder during the encounter. Defense Ex. B, Stout Depo., 44:11-22. Marble never told Stout his left shoulder was injured or hurting. Defense Ex. B, Stout Depo., 32:9-11; 46:11-22, Ex. R, Stout Audio, 1:11:09; Ex. S, Transcript, 50:22-51:5.

**RESPONSE: Deny.** Stout actively engaged in conversation with Gordon throughout the ride to the Kane County Jail. During the transport Gordon complains approximately fourteen (14) times that he was in pain. Additionally, the audio transmission clearly indicates that Gordon was informing the Officers he was in pain. Gordon was in great pain about this whether it was his right or left shoulder is irrelevant and certainly a matter for a jury to determine.

47. Stout recorded the audio of his entire interaction with Marble beginning with Stout's arrival at the ranch exit through their arrival at the Jail. Defense Ex. B, Stout Depo., 32:9-11; 46:11-22; Ex. R, Stout Audio, 1:11:09; Ex. S, Transcript, 50:22-51:5.

**RESPONSE: Deny.** Gordon believes there are several occasions that he spoke to Officer Stout about his shoulder injury and the handcuffing policy that do not appear on the audio, thus it is denied that it is a complete and accurate version of the audio. Additionally, the entire event cannot be accurately depicted by audio alone. *See* Exhibit 3, 47:22-23, 50:22-51:2.

48. Marble had a pre-existing right shoulder injury he believed could only have been work related because he works installing natural stone and granite. Defense Ex. I, Marble Depo., 11:20-12:12.

**RESPONSE: Deny.** The citation to Gordon Marble's deposition is misleading and not accurate to the testimony Gordon provided. Gordon testified that his shoulder injury was "most

likely" a work-related injury. Plaintiff's Exhibit 7, Gordon Marble Depo., 12:6-9. This fact leaves the false impression that his injury was only caused by his work, but, it could have been caused by a plethora of other things.

49.    Marble's right shoulder injury was not diagnosed by a physician or treated prior to his arrest. *Id.* at 13:6-17.

**RESPONSE: Deny in Part.** Gordon testified that his daughter, who is a nurse practitioner, and a son who was in medical school, both looked over him after he started having pain in his right shoulder and told him it was most likely a torn rotator cuff. Additionally, Gordon discussed his pain with his family doctor briefly, and was told that he should see an orthopedic doctor. Gordon Depo., 12:15-13:13.

50.    Three weeks after his arrest, he had a routine physical and did not mention any shoulder injuries or pain. Defense Ex. M, November 9, 2016, Medical Notes.

**RESPONSE: Deny in Part.** In Gordon's deposition he contradicts that he never mentioned it to his doctor during his routine physical. He states that when he did mention the pain, his doctor referred him to an orthopedic surgeon. Gordon Depo., 59:6-17. Additionally, it is common that not everything that is mentioned in a physical will be charted in a patient's medical record, especially if the doctor referred the patient to another doctor.

51.    Marble did not seek any medical care for his right shoulder for five months. Defense Ex., K, p.1; March 15, 2017, Medical Notes. On March 17, 2017, when Dr. Dee diagnosed him with a right rotator cuff tear. *Id.* at p. 4. According to the notes from that doctor visit Marble did not tell Dr. Dee about any left shoulder pain or injury. *Id.* at pp. 1-4.

**RESPONSE: Deny in Part.** Although it is true that Gordon did not go into an orthopedic doctor for approximately five months after the incident, he disputes that he did not seek

medical care. Gordon asked his family doctor about the pain in his shoulder and sought advice from his two children who were able to give him exercises to try and rehab his shoulder. Further, as Gordon explained in his deposition, he was fighting a criminal charge, and stress from the events of October 22, 2016. He did not have the ability to deal with the medical procedure on top of everything he had going on. Gordon Depo., 56:9-58:5.

52.     Twelve days after being diagnosed with the right rotator cuff tear, Marble called Washburn and complained his right shoulder was injured while being transported to the Jail. Defense Ex. F, Washburn Notes; Defense Ex. H, Washburn Depo., 41:17-22. Marble did not tell Washburn about any left shoulder pain or left shoulder injury. Defense Ex. F, Washburn Notes.

**RESPONSE: <u>Deny</u>.** Only a small written note memorializes Gordon's call to Washburn. Gordon believes he told him about his pain. Further, medical records show that Gordon called and stated that he is "also having left shoulder pain he states his left shoulder is actually hurting him more than his right shoulder." *See* Tanner Clinic Med. Records p.1.

53.     On April 14, 2017, Marble called his physical therapist and told her he was no longer having pain in his right shoulder however was not having pain in his left shoulder. Defense Ex. L, April 2017 Medical Notes, p.1.

**RESPONSE: <u>Deny in Part</u>.** The page one comments to whoever took the phone call are just one part of the medical record provided. Page two clearly states that Gordon was having continued pain in his right shoulder and was now reporting worse pain in his left shoulder than he was having in his right shoulder. Tanner Clinic Med. Records p. 1.

56.     Marble only seeks damages for injury to his left shoulder. Defense Ex. I, Marble Depo., 50:6-11.

**RESPONSE: Deny.** Nowhere in Gordon's Deposition, nor any of his pleadings does he state that he is only seeking damages for his left shoulder. In fact, the citation Defendants use to support this fact only states that Gordon's right shoulder was already injured and that his "left shoulder was injured through the experience." *See* Gordon Depo., 50:4-11. This fact is hotly disputed.

58.     The Policy states officers shall handcuff all prisoners with their hands behind their back, but states that officers "may" handcuff in the front in limited situations. Defense Ex. E, The Policy, p.1. Those instances are when the prisoner: Is in an obvious state of pregnancy.

(a) Has a physical handicap.
(b) Has injuries that could be aggravated.
(c) Must be transported a considerable distance over rough roads.
(e) Has arms that cannot be physically joined in the back.
(f) Persons known to the officer to be non-threatening.

In those instances, the handcuffs shall be secured with a belt, with the buckle located to the rear, or other restraint devices. *Id.*

**RESPONSE: Deny in Part.** It is denied that this is the actual wording of the policy. The correct statement of the handcuffing policy is as follows:

"B. Handcuffing

1.     Officers shall handcuff (double locked) all prisoners with their hands behind their back except as stated below.

2.     The officer may handcuff the prisoner with hand in front or utilize other appropriate restraining devices where the prisoner:

a.     Is in an obvious state of pregnancy.
b.     Has a physical handicap.
c.     Has injuries that could be aggravated.
d.     Must be transported a considerable distance over rough roads.
e.     Has arms that cannot be physically joined in the back.
f.     Persons known to the officer to be non-threatening.

In these cases, handcuffs shall be secured with a belt, with the buckle located to the rear, or other restraint devices."

*See*, Plaintiff's Exhibit 3, p. 2.

59.     Washburn reviewed Marble's complaints regarding his handcuffing and concluded that double-cuffing Marble behind the back did not violate the Policy. Defense Ex. H, Washburn Depo., 35:1-6.

**RESPONSE:** **Deny.** Gordon denies that Washburn ever did a thorough investigation into his complaint.

## STATEMENT OF ADDITONAL UNDISUPTED FACTS

Pursuant to Rule 56, Fed.R.Civ.P., the following facts are undisputed as a matter of law and justify denying summary judgment to Defendants:

**A.     The Hunting Party.**

1.     On October 22, 2016, Gordon was hunting on private property owned by his brother-in-law John Bramall. Exhibit 1, Crime Report, p. 4.

2.     Gordon was hunting with his son John Marble, and his brother-in-law John Bramall. Gordon Depo., 14:22-15:16; Exhibit 1, pp. 4-9.

3.     Gordon was an occasional hunter, and not cognizant of some of the finer points of hunting regulations. Gordon was unaware that this private property was designated as a no-hunting area by the State of Utah Department of Wildlife Resources ("DWR"). *See* Marble Affidavit, ¶3.

4.     Gordon possessed all the proper hunting permits and tags to hunt in the region. *Id.*

**B.     The Surveillance.**

5.     Officer Stout, an investigator with DWR, conducted a day long surveillance on John Bramall's ranch the day of October 22, 2016. Exhibit 1, p. 4; Stout Depo., 8:20-25.

15

**6.** Throughout the day Stout witnessed the party, hunting on the private, enclosed ranch, owned by John Bramall. Exhibit 1, pp. 4-5.

**7.** In the evening Stout witnessed the party go behind a hill and heard two-gun shots. *Id.*

**8.** Sometime later Stout witness the party reappear with two mule deer in the back of their ATV. *Id.*

**9.** Stout called another DWR Investigator, Officer Hovinga, and asked him to wait at the exit of the private property to pull over the hunting party when they left. *See* Exhibit 1, pp. 4-9; Stout Depo.; 10:10-11:6; Hovinga Depo., 9:12-8.

**C.** **Traffic Stop & Arrest.**

**10.** At approximately 8:00 pm, Gordon and John Marble exited the private ranch in Gordon's truck. Exhibit 1, p. 7.

**11.** Hovinga initiated a traffic stop, and arrested Gordon and John Marble for illegally shooting mule deer on private property owned by John Bramall. *Id.* at pp. 5, 7-8.

**12.** Hovinga first spoke with Gordon for approximately 30 minutes. Hovinga Depo., 14:8-19; Gordon Depo., 30:10-23.

**13.** During this initial interview Hovinga read Gordon his Miranda Warning and asked him about the hunt that he had that day. Exhibit 1, p. 7-9; Gordon Depo., 30:13-23.

**14.** Officer Charles Lawrence was also on scene to assist Hovinga with the traffic stop and arrest of the Marbles.

### D.    **Unarmed & Compliant**.

16.    Gordon and John Marble were unarmed during the traffic stop, having dropped their guns at the family cabin before leaving the ranch. Marble Affidavit ¶3, Gordon Depo., 49:1-3; 76:21-77-4; Hovinga Depo., 11:17-21; Stout Depo., 50:8-20.

17.    Gordon never physically or verbally threatened Officers on the scene and was fully cooperative. Marble Affidavit, ¶¶4, 8; Stout Depo., 13:6-15, 23:24-24:5, 24:11-18, 24:21-25:1, 33:13-18; Hovinga Depo., 11:25-12:9, 12:16-25, 13:3-14.

### E.    **Stout Arrival**.

18.    Officer Stout did not arrive on the scene of the traffic stop and arrest for approximately 30 minutes. Gordon Depo., 31:6-12; Marble Affidavit, ¶5; Stout Depo., 11:9-14; Hovinga Depo., 15:22-16:5; Exhibit 1, p. 5.

19.    Stout did not speak with Gordon for approximately fifteen (15) to twenty (20) minutes after arrival on scene at the traffic stop. Stout Depo., 15:16-16:7.

### F.    **Handcuffing**.

21.    Gordon was eventually placed in handcuffs by Officer Lawrence with his hands behind his back. Exhibit 1, p. 5.

22.    Officers Stout and Hovinga assisted Officer Lawrence while he placed the handcuffs on Gordon. Exhibit 1, p. 5, Exhibit 2, Audio 0:22:13-0:26:43 Exhibit 3, Audio Transcript, 14:3-18:25.

23.    During the handcuffing process Gordon verbally expressed to Lawrence, Stout and Hovinga that he had an existing, torn rotator cuff in his right shoulder that was serious. Exhibit 2, Audio, 0:24:20-0:24:52; Audio Transcript, 16:23-17:5.

24.     Despite this information from Gordon about his injured shoulder, Stout falsely stated that the Officers were required to handcuff Gordon behind his back because it is policy to cuff behind the back, and there were no exceptions. Exhibit 2, Audio 22:22-22:34; Audio Transcript, 14:6-9; Marble Affidavit, ¶7; Gordon Depo. 40:16-22.

### G.     DWR Handcuff Policy.

25.     DWR policy states:

1.     Officers shall handcuff (double locked) all prisoners with their hands behind their back except as stated below.

2.     The officer may handcuff the prisoner with hand in front or utilize other appropriate restraining devices where the prisoner:

    a.     Is in an obvious state of pregnancy.
    b.     Has a physical handicap.
    c.     Has injuries that could be aggravated.
    d.     Must be transported a considerable distance over rough roads.
    e.     Has arms that cannot be physically joined in the back.
    f.     Persons known to the officer to be non-threatening.

In these cases, handcuffs shall be secured with a belt, with the buckle located to the rear, or other restraint devices."

*See*, Plaintiff's Exhibit 4, p. 2.

### H.     Exceptions.

26.     Gordon met several of the exceptions to this policy. Officer Stout testified that Gordon met at least one exception. Stout Depo., 22:2-6.

### I.     Transport.

27.     Stout transported Gordon in his truck, approximately forty-five (45) minutes to the Kane County Jail. Exhibit 1, p. 5; Gordon Depo., 41:14-24; Marble Affidavit, ¶9; Exhibit 2, 0:27:42-1:13:48.

**28.**     During the transport Gordon never made Stout feel threatened, or ever verbally or physically threatened Stout. Stout Depo., 33:13-18.

**29.**     Gordon complained to Stout throughout the transport about the increasing pain in his right shoulder, and that the handcuffing was making it worse. *See* Exhibit 2, Audio 0:28:52-0:28:56, 0:29:28-0:29:39, 0:54:20-0:54:42, 1:02:22-1:02:29, 1:02:43-1:03:07, 1:09:45-1:09:50, 1:10:26-1:11:25; Audio Transcript, 20:21-23, 21:7-10, 42:16-24, 47:13-17, 47:25-48:6, 50:11-12, 50:18-51:2.

**30.**     Stout offered one time to stop to allow Gordon to stretch, but Gordon wanted to just get the trip over with and chose to endure the pain so that it would end quicker. Exhibit 2, Audio 0:54:55-0:55:16; Audio Transcript, 43:4-10; Gordon Depo., 45:9-16, 46:21-47:6.

**31.**     As Stout was pulling into the sallyport at the Kane County Jail Gordon's left arm hit the armrest and he felt extreme pain in his left should. Gordon Depo., 47:21-23; Marble Affidavit ¶9.

**32.**     Gordon cried out in pain to Stout. Exhibit 2, Audio 1:02:43-1:03:07; Audio Transcript, 50:22-51:2.

**J.     Medical Treatment.**

**33.**     Gordon did his best to rehab his right shoulder on his own before seeking medical treatment. Gordon Depo., 52:5-12; Marble Affidavit ¶11.

**34.**     Gordon's daughter and son, who are both health care professionals, had previously told Gordon it was likely a torn rotator cuff. Gordon Depo., 12:15-13:13.

**35.**     Gordon only sought treatment after encouragement from his wife after witnessing him in pain for more than 6 months. Plaintiff's Exhibit 13, Helen Marble Affidavit, ¶9; Gordon Depo., 56:9-58:5.

36.     Gordon was referred by his family doctor to an orthopedic doctor. Gordon Depo., 52:5-12, 59:6-10.

37.     On March 15, 2017, Gordon saw Dr. Michael Dee, at Tanner Clinic for his right shoulder pain. Gordon Depo.,52:5-12; Exhibit 5, Medical Records.

38.     Dr. Dee confirmed that Gordon pre-existing right shoulder injury was severely aggravated as a direct result of his being handcuffed behind his back for an extended period of time. *Id.*

39.     After his initial exam, Gordon called to inform Dr. Dee that he was having significant pain in his left shoulder. Exhibit 5.

40.     Gordon was subsequently diagnosed with a left rotator cuff tear. Exhibit 5, Medical Records; Gordon Depo., 56:3-8; Marble Affidavit, ¶12.

K.     **DWR Complaint.**

41.     On March 29, 2017, Gordon called Lieutenant Paul Washburn to complain about the handcuffing. Exhibit 6.

42.     Washburn was the Supervisor of Hal Stout. Plaintiff's Exhibit 11, Paul Washburn Deposition, 5:18, 5:23-25.

43.     Fowlks and Washburn were negligent in the way that they trained their investigators and staff regarding handcuffing behind the back.

L.     **Surgeries.**

44.     Dr. Dee informed Gordon that surgery would be necessary to correct the damage done to both shoulders. Exhibit 5.

**45.**     On April 25, 2017, Gordon underwent a total of four surgeries to repair the torn rotator cuff injuries caused by the handcuffing. Marble Affidavit ¶13, Gordon Depo., 69:20-24.

**46.**     Gordon was unable to work for 24 weeks due to his recovery from his multiple surgeries. Marble Affidavit ¶14; Gordon Depo., 69:18-24, 82:8-13.

**M.     Loss of Business.**

**47.**     Gordon was unable to work as he did before his injury due to the damage his shoulders had sustained. Marble Affidavit, ¶14; Gordon Depo., 69:18-24.

**48.**     This caused substantial business losses. Gordon Depo.,70:13-71:11, 81:19-83:6; Exhibit 15, Expert Report.

**49.**     Gordon was forced to shut down his Southern Utah business operations and closed his business accounts because he was unable to keep them running due to his injuries. Gordon Depo., 70:3-7; Exhibit 15, Expert Report.

**50.**     Gordon was forced to hire two additional employees to replace him while he has been recovering. Gordon Depo., 82:8-83:6.

## STANDARD OF REVIEW

"Summary judgment should be granted if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011) However, all reasonable inferences should be drawn in a light most favorable to [Gordon] as the non-moving party. *Id.* at 1238 as cited in *Finlinson v. Millard County, et al*, 2018 WL 5438436, *13 (D. Utah 2018) The Court should deny summary judgment "if the dispute about a material fact is 'genuine' that is, if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court should deny summary judgment where there are questions of fact on qualified immunity. *Harper v. Rose*, 2012 WL 1150463 (D. Utah 2012). Qualified immunity protects officers from liability and the burdens of litigation arising "from their exercise of discretion." *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019). The question that must be asked is whether a reasonable officer could be aware that his conduct is in violation of the law. *Saucier v. Katz,* 533 U.S. 194, 201-02 (2001). It is not required to have a case with nearly identical facts; however, the existing case law must establish clear contours for the right that provides fair notice to the officer. *Id.*

## **ARGUMENT**

### **POINT I**

#### *~ Hovinga is liable under §1983 ~*

**HOVINGA IS LIABLE BECAUSE AS HE WAS THE "CATALYST" THAT SET INTO MOTION THE CHAIN OF EVENTS THAT LEAD TO GORDON'S CONSTITUTIONAL RIGHTS BEING VIOLATED.**

**A.      Hovinga's Personal Involvement.**

Defendants claim that Officer Hovinga "did not personally participate in any violation of Marble's constitutional rights." Defendants' MSJ p. 28. That because Hovinga did not "(1) arrest Marble, (2) handcuff Marble, (3) hear Marble tell Lawrence or Stout about his rotator cuff, or (4) drive Marble to jail," that he is entitled to "summary judgment and dismissal of Marble's claims against him." *Id.* Defendants state "[a] plaintiff must produce some evidence or specific factual allegations showing that each individual defendant was personally responsible for the activity at issue." *Id.* at 27 (citing *Mink v. Knox,* 613 F.3d 995, 1001 (10th Cir. 2010). However, a closer reading of *Mink* establishes that "direct participation is not necessary" for liability under

Section 1983. *Mink,* 613 F.3 at 1001. (citations omitted). Additionally, the Tenth Circuit has established:

> For liability under [S]ection 1983, **direct participation is not necessary**. Any official who 'causes' a citizen to be deprived of [his] constitutional rights can also be held liable. The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have knew would cause others to deprive the plaintiff of [his] constitutional rights.

*Buck v. City of Albuquerque,* 549 F.3d 1269, 1279-80 (10th Cir. 2008) (emphasis added). In *Buck,* antiwar protestors sued city police Captain John Gonzales under §1983, for his actions during the protests that led to violations of their constitutional rights. Capt. Gonzales challenged the district courts denial of summary judgment and claimed that he "did not violate the [] Plaintiffs' constitutional rights because he was not personally involved in their arrests or seizures," among other things. *Id.* at 1280. The Tenth Circuit agreed with the District Court stating that though Capt. Gonzales may not have participated personally in some of the arrests he was "intimately and personally involved in the preparation and planning" of the police force that day, and that "Capt. Gonzales' personal involvement was the catalyst of the chain of events leading to…plaintiffs' arrests." *Id.*

Like Gonzales, Hovinga was the "catalyst," and "intimately and personally involved" in the chain of events that lead to Gordon's constitutional rights being violated. First, Hovinga was told by Stout, who had been watching Gordon and John for hours, to wait at the ranch exit to stop Gordon's truck when the Marbles were leaving on October 22, 2016. Hovinga Depo., 9:12-10:8; Stout Depo., 10:10-11:14. Second, Hovinga initiated the traffic stop. Exhibit 1, p. 8. Third, after Hovinga stopped Gordon, they spoke for approximately thirty (30) minutes, which included giving Gordon his Miranda warning. *Id.* Fourth, Hovinga drafted an arrest report outlining in detail his involvement in the arrest, and detention of Gordon Marble. *See* Exhibit 1,

pp.7-9. Fifth, Hovinga was present during the handcuffing of Gordon and heard his warning about his rotator cuff being injured. Marble Affidavit¶10, Exhibit 2, 0:24:20-0:24:52; Audio Transcript 16:23-17:25. Sixth, Hovinga was present to witness the double cuffing of Gordon after Gordon expressed great discomfort with the one set of handcuffs. Exhibit 1, p.5; Exhibit 2, 0:22:13-0:26:43; Marble Affidavit, ¶10. Like the Defendant in *Buck,* though Hovinga did not personally place the handcuffs on Gordon, he was central to the planning and execution of the arrest. Additionally, the report that Hovinga filled out shows that he was the one who lawfully detained Gordon, read his Miranda Rights to him and questioned him. Hovinga's stop and detention of Gordon was the "catalyst" in the chain of events that led to Gordon's rights being violated and the injury to his shoulders. Thus, Defendant's Motion for Summary Judgment must fail. As caselaw clearly indicates, Hovinga can be liable even if he did not actually place the handcuffs on Gordon himself.

### B.     Eighth Amendment Does Not Apply.

Defendants cite several cases involving Eighth Amendment standards, and supervisor liability. None are applicable in this case. In *Perry v. Duborow,* 892 F.3d 1116 (10th Cir. 2018), Plaintiff brought a §1983 action against a county sheriff under the theory of supervisor liability for the rape she suffered by a guard while in jail. Because §1983 does not authorize liability under the theory of respondeat superior, Plaintiff had to establish the sheriff's (1) personal involvement, (2) causation, and (3) state of mind. *Perry,* 892 F.3d at 1121. (citations omitted). This test is not applicable to Gordon. Gordon has alleged violations of his Constitutional rights under the Fourth Amendment. *See* Plaintiff's Exhibit 14, Doc. 5, Amended Complaint pp.12-16. Gordon has never claimed Hovinga to be a supervisor of the DWR and is not seeking action against him under the theory of supervisor liability. Thus, these standards are not applicable, and are

misleading to the extent that these cases concerned a Plaintiff suing a supervisor who was not involved in any aspect of the Plaintiff's constitutional violations. Hovinga was involved in all aspects of Gordon's constitutional rights violations.

Defendant Hovinga initiated the traffic stop on Gordon, spoke with him for approximately 30 minutes on the side of the road, was present for the handcuffing, and double cuffing of Gordon, and wrote a report after the arrests of John and Gordon. Even though Hovinga may not have personally put on the handcuffs, it does not negate his liability under § 1983. Plaintiff has shown that Hovinga set into motion a series of events that led to Gordon's rights being violated. Additionally, Plaintiff genuinely disputes the allegation that Hovinga did not know about his rotator cuff injury, or that he was not present for the handcuffing. Gordon had a 30-minute conversation with Hovinga, and remembers Hovinga standing behind him with Stout, while Lawrence handcuffed him. *See* Exhibit 2, 0:24:20-0:24:52; Exhibit 3, 14:3-18:25. Therefore, Defendants' Motion for Summary Judgment should be denied.

## POINT II

### *~ Graham Factors Weigh in Plaintiff's Favor ~*

**ALL THREE GRAHAM FACTORS WEIGH IN PLAINTIFF'S FAVOR BECAUSE (1) THE OFFENSE WAS MERELY A FELONY BECAUSE OF STATUTE, (2) GORDON WAS NOT AN IMMEDIATE THREAT TO OFFICERS, AND (3) GORDON WAS NOT FLEEING OR ATTEMPTING TO EVADE ARREST.**

**A.      Fourth Amendment Violation, Use of Excessive Force.**

Claims for excessive force are judged under the objective reasonableness test set forth in *Graham v. Connor,* 490 U.S. 386 (1989). Determining if the force used is reasonable under the Fourth Amendment requires a careful balancing of the "nature and quality of the intrusion on the individual's Fourth Amendment Interests" against the governmental interests. *Id.* at 396. The

Court will look to three factors including: (1) the **severity of the crime**; (2) whether the suspect poses an **immediate threat** to the safety of the officers or others; (3) and whether he is actively **resisting arrest or attempting to evade** arrest by flight. *Id.* "[T]he question is whether the officers' actions are 'objectively reasonable' *in light of the facts and circumstances confronting them*, without regard to their underlying intent or motivation." *Id.* at 397 (emphasis added). "In the context of an excessive force case, an officer's violation of the *Graham* reasonableness test is a violation of clearly established law if there are no substantial grounds for a reasonable officer to conclude that there was legitimate justification for acting as [he] did." *Alusa v. Salt Lake County,* 2013 WL 3946574, *5 (D. Utah 2013) (quoting *Casey v. City of Federal Heights,* 509 F.3d 1278, 1286 (10th Cir. 2007).

### B.     <u>Gordon's Charged Crime is Just ONE Factor</u>.

The first *Graham* factor looks to the severity of the alleged crime. Although Gordon was charged with a felony, which was pled down to a misdemeanor, the Tenth Circuit has recognized that "[a]lthough the severity of the alleged offense is a factor in evaluating an excessive force claim, a court must also consider officer safety concerns and whether the suspect cooperates or resists." *Cortez v. McCauley,* 478 F.3d 1108, 1128 (10th Cir. 2007) (citing *Graham,* 490 U.S. at 396). Further, a court has previously held in *Alusa v. Salt Lake County,* 2013 WL 3946574, *6 (D. Utah 2013), that a "plea bargain in state court is *only somewhat helpful* in determining the details of the interaction" between the parties on the scene. (emphasis added). The court "must evaluate the case from the perspective of a *reasonable officer at the scene.*" *Id.* (emphasis added).

Defendants cite several cases to establish that handcuffing Gordon was necessary since he was arrest for a felony. However, none of these cases are analogous to the circumstance confronting DWR Officers on October 22, 2016. For example, Defendants cite *Muehler v. Mena*,

544 U.S. 93,100 (2005), stating that "handcuffing is an appropriate response to officer-safety concerns." But in *Muehler* Officers were investigating a "gang-related, drive by shooting" and officers had reason to believe one of the gang members lived the house they were searching. *Id.* at 95. Officers believed the suspect was a wanted individual and was "armed and dangerous." *Id.* When officers searched the residence, they did so by using a SWAT team and handcuffed the four occupants and then detained them in the garage. *Id.* at 96. The Supreme Court reviewing the use of handcuffs on the individuals in the home concluded that the use of handcuffs was reasonable. First, the search was pursuant to a warrant. *Id.* at 99. Second, the governmental interest in . . . using handcuffs [] are at their maximum when. . . a warrant authorizes a search for weapons and a wanted gang member resides on the premises" because the "risk of harm to both officers and occupants." *Id.* at 100. These facts are significantly different than those presented in this case. It is a disputed fact if Gordon was a safety concern. Gordon was not a member of a gang and was not alleged to have committed a violent crime. Defendants' citation of these cases without facts is misleading. Although Gordon was arrested and eventually charged with a felony, this should not weigh against Plaintiff, because as articulated above, it was only a felony by statute, not because of violence or illicit actions.

It is important to note that Plaintiff is not and has not challenged the validity of the charges nor the plea agreement imposed upon him after the events of October 22, 2016. Defendants make a large to-do about Gordon being charged with "felony," but fail to recognize that not all felonies are created equal. The charge that Gordon plead guilty to was not a felony. The felony charge was only because the deer happened to have a certain size outside antler measurement. They fail to mention that Gordon had valid tags to hunt or that the willful omissions of his brother-in-law lead to his arrest and conviction. This statutory charge should not weigh against Gordon

and could be found by a reasonable jury to weigh in his favor. Thus, the Defendants' Motion for Summary Judgment should be denied.

## C.   Not an Immediate Threat to Officers.

"The second *Graham* factor. . . is undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Pauly v. White,* 874 F.3d 1197, 1216 (10th Cir. 2017). "Under the second factor, an officer may use increased force when a suspect is armed, repeatedly ignores police commands, or makes hostile motions towards the officer or others." *Mglej v. Gardner,* 974 F.3d 1151, 1168 (10th Cir. 2020) (citing *Donahue v. Wihongi,* 948 F.3d 1177, 1196 (10th Cir. 2020)).

"[U]nder this *Graham* factor, the threat ***must be immediate, not potential****. Harper v. Rose,* 2012 WL 1150463, *7 (D. Utah 2012) (quoting *Graham,* 490 U.S. at 396) (emphasis added).

Defendants claim that Gordon was an immediate threat to Officers. Defendants MSJ p. 39-40. But that is completely counter to their testimony, and their written reports. Defendant Stout testified "[o]ther than committing a crime in my presence, he made no verbal or physical threats towards me." Stout Depo., 24:3-5. Additionally, Stout testified that Gordon never made any physical or verbal threats towards him. *See* Stout Depo., 24:11-18. Defendant Hovinga also testified that Gordon Marble never verbally or physically threatened him. Hovinga Depo., 12:20-25.

The Defendant Officers' perceived threats, after the fact, were totally subjective and it is important to note have only been raised for the first time in their Motion for Summary Judgment. Defendants' MSJ pp.39-40. These subjective beliefs are based on what could have ***potentially*** happened if the circumstances were different. They are not based on an immediate threat, which is what is required by *Graham*.

Most importantly, a reasonable jury could believe that this situation, and the alleged need to use force were unreasonable and excessive given that Gordon was completely compliant, non-threatening, and even gracious in acknowledging his wrongdoing for hunting on restricted land. Further, whether the Officers did or did not have *subjective fears* is not the appropriate standard. The standard is how an *objectively reasonable* officer would have responded under similar circumstances. Any reasonable officer would have realized that Gordon's rotator cuff would be injured further if they handcuffed him behind the back for almost an hour. Especially given that Gordon was a bigger man, who could not even put his hands together behind his back and required double cuffing. At the very least, this is a question upon which a reasonable jury could differ. Thus, this factor weighs heavily in Plaintiff's favor.

D.    <u>Not Fleeing or Actively Resisting Arrest</u>.

The third *Graham* factor asks whether Gordon was actively resisting arrest or attempting to evade arrest by flight. As the audio of the incident clearly shows, Gordon was compliant and courteous to Officers.

The standard that the Defendants wish the Court to adopt is contrary to the standards set forth in *Graham*. It cuts against *Graham* and all the subsequent cases that have clearly established that force by Officers must be "objectively reasonable in light of the facts and circumstances **confronting them,** without regard to their underlying intent or motivation." *Graham*, at 397. (emphasis added; internal punctuation omitted). The Court is not allowed to look back with "20/20 vision of hindsight." *Pauly,* 874 F.3d at 1215. Yet, this is exactly the standard the Defendants urge the Court to adopt. The new standard urged by Defendants is that if an officer "subjectively" feels that a citizen could potentially be a threat, after the arrest has taken place, and after testifying otherwise, use of excessive force is permitted.

## POINT III

### ~ *Not Entitled to Qualified Immunity* ~

**QUALIFIED IMMUNITY DOES NOT APPLY BECAUSE THE TENTH CIRCUIT HAS HELD THAT USE OF HANDCUFFS IN THE CIRCUMSTANCES OF THIS CASE CAN BE EXCESSIVE FORCE UNDER THE FOURTH AMENDMENT.**

**A.      Qualified Immunity Does Not Apply.**

"Qualified immunity provides immunity from suit rather than a mere defense to liability." *Harper v. Rose*, *3 (citations and internal punctuation omitted). In order to overcome qualified immunity, a two-pronged inquiry must be made. *First*, the facts, "[t]aken in the light most favorable the party asserting the injury, [must] show the officer's conduct violated a [federal] right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001. *Second*, that right must be "'clearly established' at the time of the violations." *Tolan v. Cotton*, 572. U.S. 650, 656 (2014 (quoting *Hope v. Pelzer*, 536 U.S. 730 (2002). The prongs need not be analyzed in a specific order. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

A right is "clearly established" when the action of violating that right is such that a reasonable person would have known that it is against the law. *Tolan*, 572 U.S. at 656. "Officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Handy v. City of Sheridan*, 636 F. App'x 728, 738 (10th Cir. 2016 (quoting *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015). The Supreme Court has held that a generalization of the law is insufficient for this prong to be established, but rather the inquiry "must be undertaken in light of the specific context of the case." *Saucier*, 533 U.S. at 201. However, the Court "expressly rejected a requirement that previous cases be fundamentally similar . . . [T]he salient question . . . is whether the state of the law . . . gave [defendants] fair warning." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The fact that the use of handcuffs can constitute excessive force was

clearly established as early as the Tenth Circuit's decision in *Fisher*, which was issued in 2009. *Fisher v. City of Las Cruces,* 584 F.3d 888 (10th Cir. 2009).

In *Fisher v. City of Las Cruces,* 584 F.3d 888, 901 (10th Cir. 2009), the Tenth Circuit reestablished that "a triable claim of excessive force exists where a jury could reasonably conclude that the officer handled a cooperating arrestee in a manner that the offer knew posed a serious risk of exacerbating the arrestee's injuries which were themselves known to the officer."

Additionally, the Tenth Circuit Court recently held in 2020 that,

[i]n some circumstances, unduly tight handcuffing can constitute excessive force where a plaintiff alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight.

*Mglej,* 974 F.3d at 1167 (citing *Cortez v. McCauley,* 478 F.3d 1108, 1129 (10th Cir. 2007)). This is the case before the Court. Gordon Marble, a cooperating arrestee was handcuffed in a way that Officers knew posed a serious risk of exacerbating his injuries that Gordon had informed them about in their long exchange before being handcuffed. This method of handcuffing was unreasonable, excessive, and resulted in Gordon injuring his both rotator cuffs resulting in surgery and twenty-four (24) weeks off work to heal form his injuries.

## B.      Defendants' Cases Are Materially Distinguishable.

Defendants try and distract the Court from the real issues in this case. Plaintiff has alleged a Fourth Amendment excessive force claim and has not alleged Gordon's arrest to be invalid. The crux of the issue is whether a reasonable jury could believe that under these circumstances Gordon should have been handcuff behind the back instead of in front of his person because of the injuries that he had and reported to officers prior to his handcuffing. It is important to note that DWR has a specific policy on handcuffing in the front when the arrestee has "a physical

handicap", "injuries that could be aggravated", "has arms that cannot be physically joined in the back, and "persons known to the officer to be non-threatening." *See* Exhibit 4. Like Gordon.

Defendants cite to *Mglej* for the premise that though Gordon claimed a right to not be handcuffed at all "the Tenth Circuit has concluded otherwise." Defendants MSJ, p. 41. Defendants assert that it was not clearly established at the time that Officers handcuffed Gordon that he had no right to not be handcuffed. However, this is a distraction from the actual claims made by Gordon and the clearly established law with regards to excessive force and handcuffing.

It has been clearly established in the Tenth Circuit since at least *Fisher v. City of Las Cruces,* 584 F.3d 888, 901 (10th Cir. 2009), that excessive force exists "where a jury could reasonably conclude that the officer handled a cooperating arrestee in a manner that the officer knew posed a serious risk of exacerbating the arrestee's injuries, which were themselves known to the officer."

*Mglej* and *Fisher,* together with Plaintiffs' cases cited above, show that Officers Hovinga and Stout could not possibly have been justified in handcuffing Gordon **behind his back**, knowing he had a pre-existing rotator cuff injury that would be exacerbated. The handcuffing behind the back of Gordon was objectively unreasonable.

## POINT IV

### ~ *Supervisor Liability* ~

**DEFENDANTS FOWLKS AND WASHBURN ARE LIABLE BECAUSE THEY SET IN MOTION A SERIES OF EVENTS THAT THEY KNEW WOULD CAUSE THEIR OFFICERS TO DEPRIVE GORDON OF HIS CONSTUTUTIONAL RIGHT TO BE FREE FROM EXCESSIVE FORCE.**

### A.     Supervisors' Liability.

"Section 1983 liability does not authorize respondeat superior liability for a supervisor based solely on the actions of his subordinates." *Burke v. Regalado,* 935 F.3d 960, 997

(10th Cir. 2019) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, (1978). However, this does not mean that "supervisor may not be liable for the injuries caused by the conduct of one of his subordinates." *Dodds v. Richardson,* 614 F.3d 1185 (10th Cir. 2010) (citing *Scull v. New Mexico,* 236 F.3d 588, 600 (10th Cir. 2000)). Thus, to impose §1983 liability "the plaintiff must demonstrate "an 'affirmative link' between the supervisor and the violation."" *Id.* at 1195. To demonstrate an affirmative link, the Plaintiff must show "(1) personal involvement, (2) sufficient causal connection, and (3) culpable state." *Id.*

### B. Fowlks & Washburn's Personal Involvement.

A plaintiff can establish the supervisor's "personal involvement by demonstrating his 'personal participation, his exercise of control or discretion, or his failure to supervise,' or his 'knowledge of the violation and acquiescence in its continuation.'" *Id.* (citations and punctuations omitted). Additionally, "[t]he plaintiff can show such a link by establishing 'the [supervisor] promulgated, created, implemented[,] or possessed responsibility for the continued operation of the unconstitutional policy or custom.'" *Burke v. Regalado,* 935 F.3d 960, 997 (10th Cir. 2019). Further, the Tenth Circuit has held that "direct participation is not necessary." *Buck v. City of Albuquerque,* 549 F.3d 1269, 1279 (10th Cir. 2008).

Here, the Defendants claim that "Marble cannot establish that Fowlks or Washburn personally participated in the alleged violation." Defendants' MSJ, p.43. Defendants' claim that (1) neither were present at the arrest, (2) Fowlks did not supervise Hovinga or Stout, or oversee training for DWR, and that (3) Washburn did supervise Stout, but not Hovinga, and he too did not oversee training. *Id.* This however does not preclude their liability, because a reasonable jury could find that Fowlks and Washburn failed to supervise their Officers.

Fowlks, the Director of DWR, testified at his deposition that his position is to "run the entire division" of wildlife, and he "oversee[s] and supervise[s]" all six sections. Fowlks Depo., 7:6-13. However, Fowlks then goes on to testify that he does not know a lot of what goes on within the law enforcement section. Including not knowing if the DWR has certified trainers or outside instructors to train Officers. *See* Fowlks Depo., 11:15-20. He is unaware how often or if training happens for his DWR Officers or if training happens at all. *Id.* at 11: 21-23. Additionally, he is unaware if his DWR officers are even trained according to the DWR policy on handcuffing. *Id.* at 11:24-25, 12:1-6. A reasonable jury could view these facts weigh heavily in finding a lack of supervision by Fowlks, the Director of DWR. These facts show that Fowlks has created an environment within the DWR that lacks supervision on key requirements such as training. It baffles one to think that the Head of the Division of Wildlife Resource who oversees every division, would not be aware if his own officers, who are out in the field, are even trained according to his agency's own policies. Thus, a jury could find that Fowlks has created, promulgated, and possesses responsibility for the lack of supervision and the unconstitutional excessive force used against Gordon Marble.

Defendants' claim that Washburn should not be held liable because he did not personally supervise Hovinga, nor oversee law enforcement training for DWR employees. Defendants' MSJ, p. 43. Washburn at his deposition testified that he was the supervisor for Stout during the time of these events, but not Hovinga. Washburn Depo. 5:14-18. This should not negate liability.

It is true that Fowlks and Washburn did not personally participate in the excessive force used on Gordon. However, because of Fowlks and Washburn failed to supervise, and allowed

a custom of not following the handcuffing policy they created and condoned the unconstitutional practices of Hovinga and Stout.

Defendants' claim that "Marble cannot establish that Fowlks or Washburn were aware of any unofficial practice of ignoring the Policy (or that such a practice existed)." Defendants' MSJ, p. 43. But this statement itself is a question of fact for a jury to decide, and not a matter of law to be decided on summary judgment.

### C. Causal Connection.

"The second element requires the plaintiff to show that the defendant's alleged action(s) caused the constitutional violation by setting in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights." *Burke,* 935 F.3d at 997 (citing *Estate of Booker v. Gomez,* 745 F.3d 405, 435 (10th Cir. 2014). In *Buck,* the Court explained:

> [a]ny official who 'causes' a citizen to be deprived of [his] constitutional rights can also be held liable. The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights.

*Id.* at 1279-80 (citing *Snell v. Tunnell,* 920 673, 700 (10th Cir. 1990).

Defendants' claim that "neither Fowlks nor Washburn were in a professional position to assess the adequacy of the Policy or training on it." Defendants' MSJ, p.44. It is not logical that the Director of the DWR would not be in the "professional position to assess the adequacy of the policy or training" on handcuffing. Nor is it logical that the Washburn, who schedules the training for the Officers, would not know if the training, that he is scheduling, is adequate and follows DWR policies. *See,* Washburn Depo. 17:21-25, 18:1-5. This lack of supervision and responsibility to make sure their Officers are trained on the DWR policy on

handcuffing is troubling. Additionally, these facts make clear questions of material fact that need to be presented to a jury.

        This lack of supervision in training could be found by a reasonable jury to have "set in motion a series of events" that Fowlks and Washburn should have reasonably known would cause their officers to deprive Gordon of his constitutional rights. Thus, Defendants' MSJ should be denied, and this matter should go before a jury.

### C.    <u>Culpable State</u>.

        The third element in establishing supervisor liability requires showing "culpable state of mind." *Dodds,* 614 F.3d at 1199. Defendants' claim that Fowlks and Washburn did not "possess[] the requisite state of mind to support a supervisor liability claim." Defendants' MSJ, p.44. However, Defendants only cite to cherry picked statements made by Fowlks and Washburn. In context the depositions of Fowlks and Washburn clearly show a lack of supervision by Fowlks, the Director of DWR, who admits that he is unaware if his Officers are even trained on DWR policy. *See* Fowlks Depo., 11:15-25, 12:1-6. Additionally, Washburn admits that he does not know what exactly his Officers are trained on, as he "leave[s] the content of the training up to the. . . instructors." Washburn Depo., 17:21-25, 18:1-5. This lack of knowledge is troubling and frankly startling. A reasonable jury could find an 'affirmative link' between this lack of supervision and training lead to Gordon's rights being violated. Thus, Defendants' Motion for Summary Judgment should be denied.

### D.    <u>Clearly Established</u>.

       *Dodds, Buck,* and *Burke,* together with the Plaintiffs' cases cited above, show that Fowlks and Washburn could not possibly not know that their lack of supervision, enforcement, and training on DWR policies would lead to using excessive force on Gordon Marble. The

handcuffing under the circumstances of this case could be found by a reasonable jury to be 'affirmatively linked' to the lack of supervision and training that trickled down from the Director of the Department through his lieutenants and resulting in violations by his Officers.

## CONCLUSION

This Court should deny Defendants' Motion for Summary Judgment because there are many disputed facts. First, Defendants ignore evidence of the actions of Officers that occurred on October 22, 2016. Second, Gordon's actions when viewed under the Graham factors show he was not an immediate threat to officers, was not fleeing arrest, and was compliant with all commands, making handcuffing behind the back with his *known* injury unreasonable and excessive. Third, qualified immunity does not apply because it was clearly established at the time of the incident that using handcuffs under these circumstances can be excessive force under the Fourth Amendment. Fourth, Fowlks and Washburn's deliberately indifferent approach to supervising their Officers, enforcing their policies and procedures and ratification of bad conduct created this dangerous situation and allowed Gordon's rights to be violated. Fifth, there are numerous factual disputes that must be determined by a jury.

For all the foregoing reasons, the Court should deny Summary Judgment and let this case go before a jury.

DATED this 28th day of May 2021.

SYKES MCALLISTER LAW OFFICES, PLLC


 /s/ C. Peter Sorensen
ROBERT B. SYKES
C. PETER SORENSEN
CHRISTINA D. ISOM
*Attorneys for Plaintiff*