UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| GORDON MARBLE,<br>Plaintiff,<br><br>v.<br><br>WADE HOVINGA; HAL STOUT; MIKE FOWLKS; PAUL WASHBURN; and JOHN DOES 1–10,<br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT<br><br>Case No. 1:19-CV-00064-HCN<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Plaintiff Gordon Marble sues Utah Division of Wildlife Resources Officers Wade Hovinga, Hal Stout, Mike Fowlks, and Paul Washburn, asserting that Officers Hovinga and Stout deprived him of his Fourth Amendment "right to be free from excessive force," Dkt. No. 5 ¶¶ 1, 101, and that Officers Fowlks and Washburn failed to train Officers Hovinga and Stout properly and also failed to "prevent[] the development" of unconstitutional "practices and customs," *id.* ¶¶ 108, 114.[1] The court grants the officers' motion for summary judgment.

I.

On October 22, 2016, Mr. Marble hunted on a private ranch owned by a family member in Kane County, Utah. *See* Dkt. No. 62-2 at 1–2, 4. Mr. Marble did not know that the State of Utah had designated the property as a no-hunting area for wild big-game animals. *See* Dkt. No. 62-9 at 2 ¶ 3; Dkt. No. 62-2 at 2–3.

---

[1] Plaintiff seeks to hold the Defendant Officers liable in both their individual and their official capacities. It is well settled, however, that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *see also Ross v. Board of Regents of the Univ. of N.M.*, 599 F.3d 1114, 1117 (10th Cir. 2010). Defendants are accordingly entitled to summary judgment on the claims asserted against them in their official capacity.

Throughout that day, Officer Stout surveilled Mr. Marble and his hunting party from a hillside overlooking the property using a spotting scope. *See* Dkt. No. 62-2 at 4; Dkt. No. 62-10 at 8:20–10:9, 11:4–8. Late in the afternoon, the hunting party drove in an ATV behind a hill that obscured Office Stout's view. *See* Dkt. No. 62-2 at 4; Dkt. No. 62 at 16 ¶ 7. Officer Stout then heard two gunshots from behind the hill. *See* Dkt. No. 62-2 at 4; Dkt. No. 62 at 16 ¶ 7. Officer Stout later saw the hunting party driving back toward the ranch lodge with two dead deer in the back of their ATV. *See* Dkt. No. 62-2 at 4; Dkt. No. 62 at 16 ¶ 8. After returning to the lodge, Mr. Marble and the property owner "moved the deer from the [ATV] to the bed of [Mr. Marble's] truck." Dkt. No. 50-9 at 29:6–13. At the hearing on the motion for summary judgment, Mr. Marble conceded that Officer Stout observed Mr. Marble load both deer into the truck. *See* Jan. 19, 2022 hearing recording at 3:00–4:15; Dkt. No. 50 at 14 ¶ 18. Officer Stout then called Officer Hovinga and asked him to wait at the exit of the ranch property and to pull over the hunting party when they left. *See* Dkt. No. 62-2 at 4; Dkt. No. 62-10 at 10:10–11:3. Officer Hovinga in turn called Officer Charles Lawrence to provide additional assistance. *See* Dkt. No. 62-2 at 4; Dkt. No. 62-11 at 9:21–10:2, 15:18–21.

Officer Hovinga pulled Mr. Marble over as he and his son left the property in their truck and turned onto Highway 89. *See* Dkt. No. 50-9 at 29:23–24; Dkt. No. 62-11 at 11:3–6. Officer Hovinga interviewed Mr. Marble for approximately 30 minutes about the hunt. *See* Dkt. No. 62-11 at 14:8–19; Dkt. No. 62 at 16 ¶ 12. After Mr. Marble admitted to shooting the larger of the two deer—a "trophy animal"—Officer Hovinga arrested him for wanton destruction of protected wildlife, a third-degree felony. *See* Dkt. No. 62-2 at 5; Dkt. No. 50-9 at 25:14–18; Dkt. No. 50 at 14 ¶ 25. Mr. Marble was unarmed, calm, and compliant throughout the arrest. *See* Dkt. No. 50-9

at 76:21–24; Dkt. No. 62-10 at 13:6–15, 23:24–24:5, 24:11–18, 33:13–18; Dkt. No. 62-11 at 11:25–12:9, 12:16–25, 13:3–14.

Officer Lawrence handcuffed Mr. Marble in preparation for his transport to the Kane County Jail for booking. *See* Dkt. No. 62-2 at 5; Dkt. No. 62-4 at 16:9–22. Before being handcuffed, Mr. Marble told Officers Stout and Lawrence that the rotator cuff in his right shoulder was injured. *See* Dkt. No. 62-4 at 16:9–17:4; Dkt. No. 62-10 at 25:2–7. Although Division of Wildlife Resources policy clearly permits handcuffing so that the hands of the arrestee will be in front of his body when the arrestee "has injuries that could be aggravated," Dkt. No. 62-5 at III.B.2, Officer Lawrence handcuffed Mr. Marble with his hands behind his back. *See* Dkt. No. 62-4 at 16:18; Dkt. No. 50 at 16 ¶ 32; Dkt. No. 62 at 8. Officer Stout did, however, give Officer Lawrence a second set of handcuffs so that he could connect the two sets of handcuffs together to "double-cuff" Mr. Marble, which would allow greater distance between Mr. Marble's hands and thus place less pressure on his shoulders than would a single pair of handcuffs. *See* Dkt. No. 62-2 at 5; Dkt. No. 50-9 at 38:18–20; Dkt. No. 62-10 at 25:8–9, 25:17–21. Officer Lawrence asked Mr. Marble if the double-cuffs were "a little more comfortable for you," and Mr. Marble responded, "Yeah. If I can . . . ." Dkt. No. 62-4 at 17:11–13.

Officers Stout and Lawrence escorted Mr. Marble to Officer Stout's vehicle, a two-door pick-up truck. *See* Dkt. No. 62-4 at 17:24–20:4; Dkt. No. 50 at 16 ¶ 34. Upon reaching the truck, Mr. Marble told Officer Stout, "I'm going to be in a lot of pain." *Id.* at 18:15–16. Officer Stout asked Mr. Marble, "Are you okay?" and told Mr. Marble that "we can adjust the back [of the seat] if—if you would like." *Id.* at 18:17–21. Mr. Marble responded, "No, I'm good." *Id.* at 18:22.

Officers Stout and Lawrence then situated Mr. Marble in the front passenger seat of the truck and Officer Stout drove him to the Kane County Jail. *See* Dkt. No. 62-4 at 17:22–18:12; Dkt. No. 50-9 at 41:14–20, 42:12–13; Dkt. No. 50-16 at 10–11. The drive was on paved roads and lasted approximately 45 minutes. *See* Dkt. No. 50-9 at 42:10–11; Dkt. No. 62-10 at 22:12–14; Dkt. No. 50-18 at 27:42–1:13:48. During the trip, Mr. Marble repeatedly informed Officer Stout that he was in pain due to the handcuffing and voiced concern that the handcuffing was making his rotator cuff injury worse. *See* Dkt. No. 62-4 at 21:7–10, 42:16–24, 47:13–17, 48:2–6, 50:11–12, 50:18–51:2. In response, Officer Stout offered on two occasions, approximately seven minutes apart, to stop and allow Mr. Marble to get out of the vehicle to stretch. *See id.* at 42:16–43:10, 47:13–19; Dkt. No. 50-18 at 54:24, 1:02:21.[2] Mr. Marble declined both offers. *See* Dkt No. 62-4 at 43:8–10, 47:20–23. Mr. Marble's handcuffs were removed approximately "sixty to seventy-five minutes" after he arrived at the Kane County Jail. Dkt. No. 62-9 at 4 ¶ 10.

Five months later, complaining of shoulder injury, Mr. Marble saw an orthopedic physician. *See* Dkt. No. 52-1 at 1. The physician determined that Mr. Marble had a torn right rotator cuff. *See id.* at 5. Approximately one month later, Mr. Marble sought additional care for shoulder pain. *See* Dkt. No. 52-2 at 3. Mr. Marble was then diagnosed with a "[c]omplete rupture" of his left rotator cuff and a "[c]omplete tear" of his right rotator cuff. *Id.* at 5. During 2017 and 2018, Mr. Marble had three surgeries on his left shoulder and one on his right shoulder to address these injuries. *See* Dkt. No. 62-9 at 5 ¶ 13.

---

[2] In his statement of undisputed material facts, Mr. Marble asserts that Officer Stout made this offer only once. *See* Dkt. No. 62 at 19 ¶ 30. The body cam audio recording, however, clearly establishes that Officer Stout first made this offer after Mr. Marble complained about discomfort 25 minutes into the drive and repeated the offer approximately seven minutes later. *See* Dkt. No. 50-18 at 28:52, 54:24, 1:02:21; Dkt. No. 62-4 at 42:16–43:10, 47:13–19; *Scott v. Harris*, 550 U.S. 372, 379–81 (2007).

II.

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is material if it "might affect the outcome of the suit under the governing law"; a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

It is well settled, however, that "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248 (cleaned up). And "mere speculation, conjecture, or surmise"—whether couched as argument, testimony, or other evidence—"does not suffice to create a genuine dispute of material fact" and thus to defeat a motion for summary judgment. *Bones v. Honeywell, Int'l, Inc.*, 366 F.3d 869, 875–76 (10th Cir. 2004).

III.

The court first addresses Mr. Marble's claims that Officers Hovinga and Stout violated his Fourth Amendment rights. Both officers argue that they are entitled to qualified immunity. The court agrees.

A.

Qualified immunity "shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (cleaned up). The defense protects "all but the plainly incompetent or those

who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quotation omitted).

Once invoked, this defense must be sustained unless the plaintiff can (1) "make out a violation of a constitutional right," and (2) show that "the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted); *see also Burke v. Regalado*, 935 F.3d 960, 1002 (10th Cir. 2019). A plaintiff bears the "heavy burden" of satisfying both parts of this test to overcome qualified immunity and survive summary judgment. *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017). The court, however, has "discretion to decide the order in which these two prongs should be addressed, and when appropriate, does not need to address both." *Soza v. Demsich*, 13 F.4th 1094, 1099 (10th Cir. 2021).

A government official's conduct violates clearly established law when, at the time of the challenged conduct, "the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (cleaned up). This means that "police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam) (cleaned up).

It follows that neither plaintiffs nor courts may rely on rule formulations that are "too general" to establish that "particular conduct" is unconstitutional. *City of Tahlequah v. Bond*, 142 S. Ct. 9, 12 (2021) (per curiam). Indeed, the Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality." *Id.* at 11.

In all but rare cases challenging "obvious" violations of constitutional rights, the plaintiff thus "must identify a case that put [the defendant] on notice that his specific conduct was

6

unlawful." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam). To provide such notice, moreover, the case must be a "case that addresses facts like the ones" on which the plaintiff's claims are based. *Id.* For as the Supreme Court has emphasized, "the dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (cleaned up). "Such specificity is especially important in the Fourth Amendment context where it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *City of Tahlequah*, 142 S. Ct. at 11–12 (cleaned up).

**B**.

Mr. Marble argues that by handcuffing him with his hands behind his back during his arrest even though he "had been completely compliant with the officers' commands" and the officers were aware that he "had [a] recent shoulder injury," Officers Hovinga and Stout employed excessive force in violation of the Fourth Amendment. Dkt. No. 5 ¶¶ 84, 98, 100. But assuming without deciding that Officers Hovinga and Stout's actions were unconstitutional, the court concludes that Mr. Marble has failed to identify any "case that put [the Officers] on notice that [their] specific conduct was unlawful." *Rivas-Villegas*, 142 S. Ct. at 8. Mr. Marble has thus failed to show that the officers violated a "clearly established" right.

To be sure, Mr. Marble invokes *Fisher v. City of Las Cruces*, 584 F.3d 888 (10th Cir. 2009). There*,* the court stated that "[i]t is long established law of this and other circuits that a triable claim of excessive force exists where a jury could reasonably conclude that the officer handled a cooperating arrestee in a manner that the officer knew posed a serious risk of exacerbating the arrestee's injuries, which were themselves known to the officer." *Fisher*, 584 F.3d at 901. But applying recent Supreme Court precedent, the court concludes that this

statement amounts to the sort of "too general" rule formulation that fails to establish that a right is "clearly established"—especially in light of the Tenth Circuit's specific Fourth Amendment analysis in *Fisher* and its holdings in other cases, as discussed below. *City of Tahlequah*, 142 S. Ct. at 12.

In addition, *Fisher* does not "address[] facts like the ones at issue here." *Rivas-Villegas*, 142 S. Ct. at 8 (2021). In that case, Mr. Fisher shot himself in the stomach and left bicep, which was "quickly swelling to into the size of a grapefruit." *Fisher*, 584 F.3d at 891–92. When officers arrived at the scene, the only other person present was Mr. Fisher's wife, who had called 911 and turned over Mr. Fisher's gun to the officers. *See id.* at 892. The officers found Mr. Fisher "kneeling in a crouched position, with his shirt off, and his fresh wounds clearly visible." *Id.* at 892. One of the officers frisked Mr. Fisher and found no weapons. *See id.* After confirming that Mr. Fisher was unarmed, one of the officers returned to the house, leaving his partner alone with Mr. Fisher. *See id.* At that point, the officer who stayed with Mr. Fisher attempted to provide emergency medical assistance "by pressing Mr. Fisher's discarded shirt to his stomach and bicep in an effort to staunch the bleeding." *Id.* Mr. Fisher told the officer that "one bullet still might be lodged in his body." *Id.* The first officer returned from the house and—despite being well aware of Mr. Fisher's wounds—"ordered Fisher to lay flat on his wounded stomach and spread his arms over his head." *Id.* Fisher protested that he "could not do so because of his injuries." *Id.* The officer repeated his order. *See id.* When Fisher again did not comply, the second officer "place[d] her knee into Fisher's back in order to leverage his arms behind his body" against the resistance caused by "the swelling of Fisher's bicep." *Id.* The officer then handcuffed Fisher behind his back while Mr. Fisher "begged" her not to do so. *Id.* The manner of handcuffing—"with a knee to [Fisher's] back, placing pressure on his stomach wound, and with his arms brought behind his

body"—caused Mr. Fisher "excruciating pain." *Id.* (internal quotation marks omitted). Mr. Fisher recounted that "[i]t felt like [his] bicep was tearing." *Id.*

The extreme facts presented in *Fisher* were critical to the Tenth Circuit's Fourth Amendment analysis. Indeed, in holding that a jury could conclude that "the officers used greater force than would have been reasonably necessary," that court emphasized that "a reasonable jury could find the officers in this case knew," *inter alia*, that Mr. Fisher "suffered from *grave injuries in need of immediate medical attention*," and that "the actions the officers took could have *seriously aggravated* his injuries." *Id.* at 896 (emphases added).

Here, the officers encountered an injury much less obvious and severe than the fresh gunshot wounds in *Fisher*. Although Mr. Marble informed the officers of his rotator cuff injury, Officer Stout had observed Mr. Marble help transfer two deer—one a large trophy animal—from an ATV into the back of his truck earlier that day, and Mr. Marble acknowledged personally shooting one of the deer. Nothing in the record here could support a reasonable jury's finding that Mr. Marble "suffered from grave injuries in need of immediate medical attention"—let alone that the officers knew this.

The officers in this case also made many attempts to accommodate Mr. Marble's self-reported injury. The officers double-cuffed him to reduce pressure on his shoulders. Officer Lawrence then asked Mr. Marble whether he was more comfortable, and Mr. Marble indicated that he was. In addition, when, upon reaching the truck, Mr. Marble stated that he was "going to be in a lot of pain," Officer Stout asked him whether he was "okay" and offered to adjust the back of the passenger seat if Mr. Marble would like—an offer that Mr. Marble declined, saying, "I'm good." Dkt. No. 62-4 at 18:15–16, 18:17–21, 18:22. And when Mr. Marble complained of pain during the drive to the jail, Officer Stout twice offered to stop and let Mr. Marble get out of

9

the vehicle and stretch. Under these circumstances, it is doubtful that a reasonable jury could find that the officers knew their actions could "seriously aggravate[]" Mr. Marble's shoulder injury. To the contrary, the officers repeatedly sought to avoid this result.

And regardless of whether the officers' efforts to accommodate Mr. Marble's injury were sufficient, these efforts stand in sharp contrast to the callous disregard for Mr. Fisher's obvious injuries exhibited by the officers in *Fisher*. Given these clear distinctions between facts that were central to the constitutional analysis in *Fisher* and the circumstances of Mr. Marble's case, the court cannot conclude that *Fisher* "squarely governs the specific facts at issue" here, *City of Escondido*, 139 S. Ct. at 503, or "clearly established" "the violative nature of [Officer Hovinga's and Stout's] *particular* conduct," *Mullenix*, 577 U.S. at 12.

The same is true of *Martin v. Board of County Commissioners of County of Pueblo*, 909 F.2d 402 (10th Cir. 1990), which the court in *Fisher* cited in support of its statement of "long established law." *Fisher*, 584 F.3d at 901. In *Martin*, the Tenth Circuit held that officers used excessive force when they forced Ms. Martin from her hospital bed and into a police van—despite knowing that she had a fractured neck—so that she could be processed at the police station for a speeding violation. *See Martin,* 909 F.2d at 403–04, 407. There can be no doubt that the existence and extent of Ms. Martin's injury—which confined her to a hospital bed—was more obvious and apparent to the officers in that case than was Mr. Marble's self-reported injury, which did not prevent him from firing a rifle and lifting deer. There is also an obvious difference in the "serious known risk of physical trauma" presented by the possibility of mishandling a fractured neck and the possibility of aggravating an injured rotator cuff. *Id.* at 407. Moreover, the difference between the inflexibility shown by the officers to Ms. Martin and the series of accommodations made or offered by Officers Hovinga and Stout is stark. In all events, although

10

the officers in *Martin* threatened to handcuff Ms. Martin, they do not appear actually to have done so. *See id.* at 404. *Martin* thus does not appear to speak to the issue of when handcuffing amounts to excessive force. For all of these reasons, *Martin* is plainly not a "case that addresses facts like the ones" here, and thus could not have put a reasonable officer in Officer Hovinga's or Stout's position "on notice that his specific conduct was unlawful." *Rivas-Villegas*, 142 S. Ct. at 8.[3]

By contrast, in cases involving less extreme facts more similar to those at issue here, the Tenth Circuit has held that officers did not employ excessive force in violation of the Fourth Amendment by handcuffing arrestees with pre-existing injuries with their hands behind their backs. In *Morreale v. City of Cripple Creek*, the court rejected a claim of excessive force even though the officer "handcuffed Morreale with her hands behind her back . . . despite Morreale's

---

[3] *Fisher* also relied on *Howard v. Dickerson*, 34 F.3d 978 (10th Cir. 1994), though only with a "cf." citation. *See Fisher*, 584 F.3d at 901. There, the Tenth Circuit affirmed the denial of a motion to dismiss a claim for deliberate indifference to known medical needs based on allegations of similarly severe facts. *See Howard*, 34 F.3d at 979–81 (Plaintiff alleged that the arresting officer handcuffed her with her hands behind her back despite her clearly visible neck brace and despite being told that "she recently underwent neck surgery" and that "handcuffing her behind the back would cause injury."). While Mr. Marble initially pleaded a claim of deliberate indifference to medical needs, *see* Dkt. No. 5 ¶¶ 76–88, he did not dispute Defendants' contention that such a claim arises under the Fourteenth rather than the Fourth Amendment, *see* Dkt. No. 50 at 28–30 (citing *McCowan v. Morales*, 945 F.3d 1276, 1290 (10th Cir. 2019)); Dkt. No. 62 at 2. And at the hearing on the motion for summary judgment, Mr. Marble made clear that he is asserting claims only under the Fourth Amendment. *See* Jan. 19, 2022 hearing recording at 37:02–38:11. Because *Howard* addressed a claim for deliberate indifference under the Fourteenth Amendment rather than a claim for excessive force under the Fourth Amendment, and because it involved significantly more severe facts in all events, the court concludes that this case, too, fails to support Mr. Marble's argument that Officers Hovinga and Stout violated his clearly established Fourth Amendment rights.

The *Fisher* court also cited two out-of-circuit cases. *See Fisher*, 584 F.3d at 901. But regardless of the facts or holdings of these cases, two cases do not amount to "the clearly established weight of authority" from other circuits and thus cannot clearly establish that Officers Hovinga's and Stout's conduct was unconstitutional. *Torres v. Madrid*, 60 F.4th 596, 603 (10th Cir. 2023).

request that she be handcuffed with her hands in front to avoid aggravating a prior shoulder injury" and despite her complaints of discomfort. 113 F.3d 1246, *1, *5 (10th Cir. 1997) (unpublished table decision). Ms. Morreale had been pulled over for running a stop sign and a standard check revealed that she was driving on a suspended license. *See id.* at *1. Although Ms. Morreale did not complain of shoulder pain during the drive to the police department, she did complain "that the handcuffs were digging into her wrists." *Id.* And "due to the cramped positioning in the back seat" of the police car, Ms. Morreale "had to sit on her hands, which caused the handcuffs to press into and scratch her wrists and to bruise her buttocks." *Id.* Ms. Morreale alleged that when she complained, the officer told her "she should not move around so much." *Id.* The court rejected Ms. Morreale's claim of excessive force even though "she suffered damage to her shoulder and to her radial nerve at the wrist" that prevented her from pursuing her career as a professional pianist. *Id.* at *2.

The Tenth Circuit reached a similar decision one year earlier in *Wells v. Oklahoma ex rel. Department of Public Safety*, 97 F.3d 1465 (10th Cir. 1996) (unpublished table decision). There, the court held that the defendant officer did not use excessive force when arresting the cooperative and non-threatening Mr. Wells for a misdemeanor and then handcuffing him with his hands behind his back despite being told that Mr. Wells' "arm was full of plates and screws," "had limited movement," and "would not go behind [his] back." *Id.* at *1–3 (cleaned up). And although Mr. Wells told the officer that his arm "was hurting," the officer "took his arms and forcefully pulled them behind his back." *Id.* at *1. When Mr. Wells "heard a 'pop' and felt intense pain in his arm," he complained about the pain to the officer and asked that he be handcuffed with his hands in front of his body. *Id.* But the officer ignored the complaint and

12

"seemed unconcerned." *Id.* A nurse who evaluated Mr. Wells the next morning found that "the tip of one screw had pierced Wells' skin . . . and another was visible beneath the skin." *Id.*[4]

Both *Morreale* and *Wells* were decided after *Martin*, and the *Fisher* court did not mention, let alone purport to overrule or repudiate either of these decisions. Reading all four cases together, the court cannot say that "the violative nature of [Officer Hovinga's and Stout's] *particular* conduct is clearly established," *Mullenix*, 577 U.S. at 12, or that the law was "sufficiently clear that every reasonable official would understand" that the officers' actions were unlawful, *Wesby*, 138 S. Ct. at 589.[5] And because Mr. Marble has failed to demonstrate that

---

[4] Mr. Marble also invokes *Vondrak v. City of Las Cruces*, 535 F.3d 1198 (10th Cir. 2008), and *Mglej v. Gardner*, 974 F.3d 1151 (10th Cir. 2020). These cases state that "the right to be free from unduly tight handcuffing" is "clearly established." *Vondrak*, 535 F.3d at 1209 (cleaned up); *see also Mglej*, 974 F.3d at 1170 (similar). Leaving aside the fact that *Mglej* was decided well after Mr. Marble's October 2016 arrest—and thus could not have constituted clearly established law at that time—the court concludes that the general rule enunciated in these cases did not provide Officers Hovinga and Stout clear "notice that [their] specific conduct was unlawful." *Rivas-Villegas*, 142 S. Ct. at 8. Furthermore, the facts of these cases, like the general rule they formulate, involved excessively tight handcuffing around the arrestee's wrists, not the manner of handcuffing—that is, how the officer handled the arrestee's body as the handcuffs were deployed, whether the arrestee's arms were secured in the front or the back of the arrestee's body in a way that made a preexisting injury worse, or whether double-cuffs were used to allow for a greater range of motion. Mr. Marble does not contend that his handcuffs were too tight. To be sure, the Tenth Circuit has held that the same general *legal* test applies in both contexts. *See Fisher*, 584 F.3d at 899. But given the obvious factual difference between excessively tight handcuffing and the manner of handcuffing, as well as the conflicting body of Tenth Circuit precedent specifically addressing the manner of handcuffing, the court concludes that a reasonable officer would not understand *Vondrak* and *Mglej* to clearly establish "the violative nature of *particular* conduct" in a case such as this one. *Mullenix*, 577 U.S. at 12.

[5] The court has little difficulty concluding that this is not a case where Mr. Marble need not identify a specific case establishing that the Officers' particular conduct was unlawful. After all, "following the lead of the Fourth Amendment's text," the context-dependent test for excessive force set forth in Supreme Court precedents is "cast at a high level of generality," *Brosseau v. Haugen,* 543 U.S. 194, 199 (2004), and thus does not by itself "create clearly established law outside an obvious case," *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (cleaned up); *see also Hodge v. Bartram*, 2023 WL 1462746, *4 (10th Cir. 2023) (explaining that "cases finding clearly established law based solely on the *Graham* factors are rare"). Especially in light of the nuances suggested by the Tenth Circuit decisions just discussed, the court cannot

13

Officers Hovinga and Stout violated a "clearly established" Fourth Amendment right, these officers are entitled to qualified immunity.

### IV.

Finally, the court considers Mr. Marble's supervisory liability claim against Officers Fowlks and Washburn for failure to train Officers Hovinga and Stout adequately and for failure to prevent the development of unconstitutional practices and customs. The court concludes that Officers Fowlks and Washburn are entitled to summary judgment on this claim.

To establish a Section 1983 claim against a supervisor, "a plaintiff must first show the supervisor's subordinates violated the constitution." *Serna v. Colorado Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006). Once an underlying violation is established, the plaintiff must demonstrate an affirmative link between the supervisor and the violation, "namely the active participation or acquiescence of the supervisor in the constitutional violation by the subordinates." *Id.* Specifically, a plaintiff must show the supervisor's "(1) personal involvement; (2) causation; and (3) state of mind." *Estate of Jensen by Jensen v. Clyde*, 989 F.3d 848, 858 (10th Cir. 2021) (cleaned up). "Supervisors are only liable under § 1983 for their own culpable involvement in the violation of a person's constitutional rights." *Serna*, 455 F.3d at 1151.

A plaintiff may establish personal involvement by a supervisor by demonstrating that the supervisor "promulgated, created, implemented, or possessed responsibility for the continued operation of" an unconstitutional policy or "the establishment or utilization of an unconstitutional . . . custom." *Burke*, 935 F.3d at 997 (cleaned up). "A complete failure to train or such reckless or grossly negligent training that makes misconduct nearly inevitable" may also

---

say that the Fourth Amendment violation here, if there was one, was "obvious." Nor can it say that the general rule set forth in *Fisher* applies "with *obvious clarity*" to the facts presented here. *Hodge*, 2023 WL 1462746, *3 (emphasis in original) (cleaned up).

constitute personal involvement. *Estate of Jensen*, 989 F.3d at 858 (cleaned up). To establish causation, a plaintiff must show that the supervisor "set in motion a series of events that [the supervisor] knew or reasonably should have known would cause others to deprive [the plaintiff] of [his] constitutional rights." *Id.* (cleaned up). Finally, a plaintiff must show that the supervisor's state of mind was such that he "knowingly created a substantial risk of constitutional injury." *Id.* (cleaned up).

Even assuming that Officers Hovinga and Stout violated Mr. Marble's constitutional rights (and the court need not and does not decide that question), the court concludes that Mr. Marble has failed to identify evidence that could support a reasonable jury finding that Officers Fowlks and Washburn "actively participated or acquiesced" in a constitutional violation by their subordinates. *Serna*, 455 F.3d at 1152 (cleaned up). As an initial matter, it is undisputed that the Division of Wildlife Resources' official handcuffing policy expressly authorizes handcuffing so that an arrestee's hands will be in front of his body when, as here, the arrestee "has injuries that could be aggravated." Dkt. No. 62-5 at III.B.2. Thus, even if the manner of Mr. Marble's handcuffing violated the Fourth Amendment under the circumstances presented in this case, that violation cannot be attributed to the Division's formal policy. It follows that Officers Fowlks and Washburn cannot be held liable for any constitutional violation that may have occurred here based on personal involvement in the "promulgat[ion], create[ion], implement[ation]," or "continued operation" of that policy. *Burke*, 935 F.3d at 997.

In addition, Mr. Marble has failed to identify any evidence to support his bald assertion that the Division's officers are not trained—or receive "reckless or grossly negligent training"— on handcuffing or the department's handcuffing policy. Mr. Marble does point to Officer Fowlks' deposition testimony that he did not know with certainty the frequency or content of the

15

Division's current handcuffing training, *see* Dkt. No. 62-13 at 11:21–12:6, as well as Officer Washburn's testimony that he "leave[s] the content of the training up to the defensive tactics instructors" and the instructors train on "whatever they feel like, from their expertise, needs to be trained on," Dkt. No. 62-12 at 17:21–18:5. But these admissions do not support a justifiable inference—as opposed to "mere speculation, conjecture, or surmise," *Bones*, 366 F.3d at 875— that the Division's officers are not trained or receive "reckless or grossly negligent" training on handcuffing. Certainly these admissions cannot support such an inference given that undisputed evidence in the record documents that the Division's officers, including specifically Officers Hovinga and Stout, did receive training on handcuffing and the Division's policy. *See* Dkt. No. 50-16 at 23–39; Dkt. No. 62-10 at 18:2–14; 18:23–19:11; Dkt. No. 62-11 at 16:21–17:2, 20:11– 14. Because Mr. Marble's speculation "does not suffice to create a genuine issue of material fact" regarding whether the Division's officers receive proper handcuffing training, his claims cannot survive summary judgment based only on his unsupported allegations to the contrary. *Bones*, 366 F.3d at 876.

      Mr. Marble has likewise failed to identify any evidence that would support a reasonable jury's finding that there was an informal custom or practice of ignoring the Division's official handcuffing policy. And even if a reasonable jury could somehow find that there was such an informal custom or practice, Mr. Marble has identified no evidence that Officer Fowlks or Officer Washburn—or *any* supervisor at the Division for that matter—was aware of it. Absent such awareness, a supervisor cannot be deemed responsible for "the establishment or utilization of an unconstitutional . . . custom." *Burke*, 935 F.3d at 997.

      Finally, both supervisors expressly testified that they had never heard of an arrestee suffering injury from being handcuffed behind the back before this case. *See* Dkt. No. 62-13 at

21:2–4 (Fowlks Dep.) (Q: "Have you ever heard of any shoulder injury aggravated by being handcuffed in the back? A: Have I personally heard of that? No."); Dkt. No. 62-12 at 27:17–20 (Washburn Dep.) (Q: "I'm just asking if you are aware of any injury that could be caused by being handcuffed in the back. A: No."). And Mr. Marble has failed to identify any other evidence from which a reasonable jury could conclude that Officer Fowlks or Officer Washburn "knowingly created a substantial risk of constitutional injury." *Estate of Jensen*, 989 F.3d at 858 (cleaned up).

In short, Mr. Marble has failed to identify any evidence that could support a reasonable jury's finding that Officers Fowlks and Washburn "active[ly] participat[ed] or acquiesce[d] . . . in the [alleged] constitutional violation by the subordinates," *Serna*, 455 F.3d at 1151, and thus "knowingly created a substantial risk of constitutional injury," *Estate of Jensen*, 989 F.3d at 858 (cleaned up). Absent such evidence, Mr. Marble's supervisory liability claim cannot survive summary judgment.

\* \* \*

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**.[6]

**IT IS SO ORDERED**.

DATED this 21st day of March, 2023

Howard C. Nielson, Jr.
United States District Judge

---

[6] In light of this disposition, Defendants' motion to exclude the expert testimony of Kelly Shafto and Rick Miranda is denied as moot.